FILED

09/24/2025

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 11, 2025 Session

## STATE OF TENNESSEE v. JOHN DAVID CUNNINGHAM

**Appeal from the Circuit Court for Rutherford County**
**No. 84128    Barry R. Tidwell, Judge**

_____

**No. M2024-00288-CCA-R3-CD**

_____

A Rutherford County jury convicted the Defendant, John David Cunningham, as charged of seven counts of rape of a child and six counts of aggravated sexual battery against his minor daughter, and the trial court imposed an effective 100-year sentence.  See Tenn. Code Ann. §§ 39-13-522 (Supp. 2013), -504(a)(4).   On appeal, the Defendant argues:  (1) the trial court erred in admitting the child's forensic interview; (2) the evidence is insufficient to sustain his convictions; (3) the trial court erred in admitting evidence of his alleged prior bad acts; (4) the trial court abused its discretion in imposing partially consecutive sentencing; (5) the trial court erred in ordering the Defendant to stop taking depositions in the divorce case and to turn over existing deposition transcripts to the State; and (6) the trial court abused its discretion in allowing the State to utilize an unauthenticated excerpt of a transcript lacking the court reporter's certification.  After review, we affirm the judgments of the trial court but remand the case for entry of corrected judgment forms in Counts 1 through 13 to reflect the Defendant's effective 100-year sentence.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**
**and Remanded for Entry of Corrected Judgments**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER, J., and JEFFREY USMAN, Sp. J., joined.

Patrick T. McNally, Nashville, Tennessee (on appeal); D. Brock East and Halle Mann, Murfreesboro, Tennessee (at trial), for the appellant, John David Cunningham.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilbur, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and Hugh T. Ammerman III and Allyson S. Abbott, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

In October 2020, the Rutherford County Grand Jury indicted the Defendant on seven counts of rape of a child (counts 1 through 7) and six counts of aggravated sexual battery (counts 8 through 13). The Defendant's daughter, A.C.,[1] was the victim in all charges.

Following the Defendant's indictment, a bitter divorce proceeding arose between the Defendant and Victoria Cunningham. Initially, the same attorney represented the Defendant in both the criminal case and the divorce case. Although the Defendant initially agreed to a stay in the divorce proceedings, he later obtained permission to proceed with the divorce case. The Defendant then issued subpoenas to several of the State's potential witnesses in the criminal case, including Ms. Cunningham[2] and A.C. In September 2022, Ms. Cunningham was deposed by the Defendant's attorney.

On November 2, 2022, the State filed a Motion to Compel Compliance with Rule 15, arguing that it needed copies of deposition transcripts that had already occurred, that any future depositions of witnesses in this case should be governed by Rule 15, and that the court should disallow any further depositions by the defense prior to the criminal trial. The trial court subsequently entered an order holding that Rule 15 did not apply to these circumstances and that this matter was an issue of pretrial scheduling. A limited scheduling order was included, requiring that any deposition transcript subject to the State's motion not be used as substantive evidence in the criminal trial, that both parties provide opposing counsel with full copies of any deposition transcripts intended to be used or that might be used at trial for impeachment purposes, that defense counsel turn over copies of any deposition transcripts of the State's potential witnesses, even if they were not anticipated to be used for impeachment purposes, and that no further depositions of any of the State's potential witnesses be taken without leave of the criminal court.

On November 9, 2022, the Defendant filed a motion seeking the admission of a video recording of A.C.'s forensic interview that occurred at the Rutherford County Advocacy Center ("CAC") on November 7, 2019. He argued that this recording possessed particularized guarantees of trustworthiness, as set out in Code section 24-7-123(b)(2), and that he was prepared to make an offer of proof of same.

---

[1] It is the policy of this court to refer to victims of sexual abuse by their initials only.

[2] Because the Defendant and Victoria Cunningham share the same last name, we will often refer to Victoria Cunningham as Ms. Cunningham. For the sake of efficiency, we will often refer to other witnesses by their last name only.

**Trial.** Jessica Bratcher, who lived diagonally from the Defendant, testified that over the last nineteen years, she had gotten to know the Defendant; his wife, Victoria Cunningham; and their two children. Bratcher stated that she and Ms. Cunningham became friends and that their children sometimes played together.

On May 28, 2019, Bratcher was walking her mother out her front door when she observed Ms. Cunninghan, who was "visibly distraught," standing on her front porch. Ms. Cunningham was dressed in pajama pants, a bra, and an unbuttoned cardigan that she attempted to hold around herself. Bratcher said Ms. Cunningham was sobbing and saying it was not going to be okay and collapsed into Bratcher's mother's arms. Bratcher noted that Ms. Cunningham was "really anxious to get in the house" and wanted to get her children into Bratcher's house. Once they stepped inside, Bratcher had one of her own children distract Ms. Cunningham's children so she and Ms. Cunningham could talk in her bedroom.

Ms. Cunningham cried and told Bratcher that the Defendant "had been molesting [their daughter], [A.C.]." She explained that the Defendant had wanted to take a bath with A.C., and when she refused to allow that, the Defendant became violent with her. She said that the Defendant "pushed her, punched her[,] and tried to take her phone," things which were later confirmed by Ms. Cunningham's two children. Ms. Cunningham also stated that A.C., who was six years old at the time, confirmed that the Defendant had been molesting her "for a long time" and provided specific details about the abuse. A.C. told her that the Defendant "penetrated her with his fingers," that he "made her perform oral sex on him" on a "regular basis," and that he took "baths with her and d[id] all manner of things." After this conversation, Bratcher made sure that Ms. Cunningham and her children got a ride to Ms. Cunningham's mother's home. She confirmed that Ms. Cunningham and her children never returned to their home after that day.

Bratcher continued to stay in contact with Ms. Cunningham because she was worried about them and wanted to know if the Defendant had been arrested. She asked Ms. Cunningham if she had reported the Defendant's abuse of A.C. because she knew it was important to report it as quickly as possible. Ms. Cunningham replied that she and her mother had filed a police report.

On June 4, 2019, Bratcher said Ms. Cunninghan told her that the criminal case against the Defendant had been dropped for "lack of evidence." When Bratcher inquired further, Ms. Cunningham told her not to worry about it because her mother was an attorney and was handling things for her. Bratcher asked why the case had been dropped so quickly without an investigation, and Ms. Cunningham became "defensive" and asserted that although it was clear Bratcher did not believe her, she was telling the truth. Bratcher then told Ms. Cunningham that if she did not convince her that she reported the Defendant's

crimes, Bratcher would report this abuse to the police.  When Ms. Cunningham stopped responding to Bratcher's texts, Bratcher informed Ms. Cunningham that she was going to file a police report about the Defendant's abuse of A.C..

On June 6, 2019, Bratcher filed a police report about the Defendant's abuse of A.C. at the Smyrna Police Department.  She notified Ms. Cunningham about the report, and Ms. Cunningham "was very upset."  Bratcher accused Ms. Cunningham of lying about filing a police report about the abuse.  However, she told the officers that she had only ever known Ms. Cunningham to be "a caring mother to her children."  Bratcher's text thread with Ms. Cunnigham from June 4, 2019, to June 7, 2019, was admitted as a collective exhibit to Bratcher's testimony, although the State never had Bratcher read these texts to the jury.

On cross-examination, Bratcher agreed that all the information about the sexual abuse allegations that she testified about on direct examination had come from Ms. Cunningham.  She acknowledged that she never questioned A.C. about these allegations.  Bratcher stated that she reported the abuse allegations to the police on May 28, 2019, because she believed that Ms. Cunningham was never going to file a police report about A.C.'s abuse.

When questioned about her text messages, Bratcher said that she felt Ms. Cunningham was lying to her about the closure of the criminal case against the Defendant because this information did not line up with what she knew about police investigations.  When Ms. Cunningham texted her that she "was filing for" divorce and mentioned the Defendant attending "therapy," Bratcher told her that if the Defendant did not have criminal charges filed against him, the court "would not let [her] keep his kids from him," and the Defendant would "continue to hurt them."  Bratcher asserted that it was clear to her that Ms. Cunningham was "easily manipulated."  She said that although Ms. Cunninghan claimed she had reported the sexual abuse allegations to the police, this was a lie.  She agreed that it would have been better for Ms. Cunningham to report the abuse allegations, rather than her.  However, Bratcher eventually informed Ms. Cunningham that she was going to report the sexual abuse allegations to the police.  Defense counsel and Bratcher then had the following exchange:

Q.     You go on to say some things, like this man is a manipulative narcissist.  He has worked to control your mind for many years.  He's a cheat and a liar.  He's totally disregarded your heart for many years, right?

A.     Yes.

Q.    Now, that information was provided to you through [Ms. Cunningham] over the years, is that right?

A.    I suppose you could say that. I also saw things. So, yeah.

Q.    Well, you saw things of him being a cheat and a liar?

A.    Yes.

Q.    How so?

A.    My husband saw him in the car with another girl when he was supposed to be on his way to work one day. I saw bruises on [Ms. Cunningham] frequently when she would come to my house. I saw many, many evidences [sic] of him being a cheat and a liar and just an all around not good man to her.

Q.    But the first time—and she did disclose certain things like that to you over the years, yes?

A.    Yes.

Q.    That he was cheating on her or abusive or what have you, yes?

A.    Yes.

Bratcher said that after she reported the sexual abuse allegations, she informed Ms. Cunningham that she had gone to the police. Ms. Cunningham said, "I'm so upset with you right now," and Bratcher replied, "You lied" in "capital letters." Ms. Cunningham denied lying to her about reporting the abuse and told her to not message her again. When asked if Ms. Cunningham realized that Bratcher was just trying to help her, Bratcher replied that Ms. Cunningham was "easily manipulated" and believed that "her mom had things under control."

The victim, A.C., testified that she was currently ten years old and in the third grade. She stated that she understood the difference between the truth and a lie and that she was only going to tell the truth during her trial testimony. A.C. explained that when she lived with her father, the Defendant, he did "inappropriate" things to her "mostly every day or every night." She acknowledged that she was "nervous" about testifying at trial and that it

was "[h]ard] to talk about the inappropriate things the Defendant did to her." When asked if the inappropriate things the Defendant did to her involved touching, A.C. replied, "Yes. Sometimes, yeah." When the prosecutor asked her what kind of touching, A.C. said, "I don't really remember. But I know that [the Defendant] would sometimes touch me where it was not okay. But I don't remember." The prosecutor asked her what parts of her body are not okay to touch, and A.C. stated, "My privates [are] not okay." A.C. said that when the Defendant touched her inappropriately, he would sometimes use his "hand" and "sometimes [his] privates." When asked where the Defendant would touch her with his hand, A.C. replied, "Mostly like the ribs like the ribs from my rib cage sometimes." When asked were there any times that the Defendant would touch her on her privates with his hand, A.C. responded, "Not that I can remember, no." When the prosecutor asked if there were times when the Defendant touched her on the butt with his hand, A.C. stated, "No."

The prosecutor then asked if the Defendant had ever touched her private with his private, and A.C. replied, "No." In addition, A.C. denied that the Defendant ever made her touch him. A.C. said she did not know if anyone's mouths were involved in the Defendant's inappropriate touching.

A.C. said one time the Defendant's privates touched her legs after the Defendant told her to have her legs "[c]rossed." When asked if there were any times that the Defendant's private touched her private, A.C. said, "No."

A.C. stated that she told her mother about the things that were going on with the Defendant "only once." Although her mother never saw anything happen, A.C. said that her mother "knew something was up." A.C. said her mother saw the Defendant and the victim "under a blanket" in her parent's bed, and "[s]he was really confused[.]" When her mother would walk in, the Defendant had his clothes "sometimes on, sometimes off." The prosecutor asked what things happened under the blanket in her parents' bedroom, and A.C. replied, "I don't really know. Like, I don't know. Maybe—but I knew something was happening that was not supposed to. But I don't know what." When asked if she remembered something coming out of the Defendant's private part, A.C. replied, "It's like white, yellowish, chunky like, thick stuff." She said this stuff from the Defendant's private went "[m]ostly on [her] chest." She said the Defendant would clean it off by "lick[ing] it off or sometimes clean[ing] it with like a paper towel." She did not state that this substance went anywhere but her chest. When the prosecutor asked how the Defendant would be when that "stuff" came out of his private, A.C. said the Defendant "would be comfortable" and relaxed.

A.C. stated that she had talked to a woman at the CAC on two different occasions about what happened with the Defendant and that these two interviews had been recorded. She watched these two recorded interviews at the prosecutor's office shortly before trial.

- 6 -

A.C. noted that these two recordings occurred in different years because in one interview she did not have glasses and in the other interview she did have glasses. A.C. said that in the first interview she was asked if anything inappropriate happened with the Defendant, and she said no. However, in the second interview, A.C. said that inappropriate things had happened with the Defendant, and she provided details. When asked why her response changed from the first interview to the second interview, A.C. replied that she was "uncomfortable" talking about it in the first interview because she was so young. When asked if she was still uncomfortable talking about the Defendant's inappropriate behavior, A.C. said, "Yeah, kind of." She added that it was "hard to remember everything."

A.C. said that during the second interview, she provided details about what the Defendant had done, and she was as truthful as she could be "without being too uncomfortable." She stated that the women interviewing her "kept asking . . . so many questions about all of this stuff."

When the prosecutor asked whether she had told the truth during the second interview when she said that the Defendant's private went into her private, A.C. replied, "I don't know. Because in the video I also did tell some things that weren't true." When the prosecutor asked, "Like what?," A.C. responded, "I don't know. Like a lot of things. Mostly a lot." The prosecutor then asked, "Anything about the stuff that had happened with your dad that wasn't true?" A.C. replied, "No, not that I remember."

The prosecutor asked what had been going on right before the white, chunky stuff came out and got on her chest, and A.C. said, "I don't know. I know it wasn't something good." She could not recall a time when the Defendant's penis touched her face.

A.C. acknowledged that she had talked to "[l]ots of people, many times" about the Defendant's inappropriate behavior. She said the first person in public she talked to about the Defendant's inappropriate behavior was the woman who interviewed her twice. After that, she talked to Dr. Janie Berryman. A.C. said that when she talked to these women, she "tr[ied] to be as truthful as [she] could without being too uncomfortable." She explained that she would get uncomfortable when people asked too many questions.

A.C. acknowledged that it took her a while before she was able to tell people she did not know about what the Defendant had done. She said that if she talked to someone one time, and then it was a long time before talking to them again, she "might still be uncomfortable." However, she stated that if she talked to someone once a week, then she probably would not feel uncomfortable talking to them.

The victim stated that no one had told her to tell lies about inappropriate things. She said neither her mother nor her grandmother had ever told her to make up stories about the

Defendant. When asked what her mother and grandmother told her about answering these hard questions, A.C. said, "They just tell me that I can be truthful and that I can tell them if I'm scared or nervous or something just to like help me so that I'm not so scared or nervous." She acknowledged that she was a little scared and nervous while testifying at trial.

A.C. acknowledged that she did not tell the truth during her first forensic interview when she claimed nothing inappropriate happened with the Defendant. However, she said that when she disclosed that something inappropriate happened with the Defendant, this was the truth. A.C. did not recall having a physical examination and did not understand what the prosecutor meant when she asked her about a "physical exam."

A.C. identified the "privates" on a male anatomical drawing at trial. When asked if the Defendant's privates ever touched her body anywhere, A.C. replied, "Not that I can remember." She did not recall talking about the Defendant making her cross her legs or about the Defendant getting on top of her with her legs crossed. She stated that she did remember one time when the Defendant "licked [her] privates." However, she quickly corrected herself and stated that the Defendant licked her privates "three or four times." A.C. said she was doing the best she could to be honest about what the Defendant did, but she admitted she was "really nervous" about having to talk about it in front of so many people.

The prosecutor then asked her, "If you were able to give more details about what kind of physical contact happened to the woman at the CAC with the drawings and Dr. Janie [Berryman], we should go with that?" A.C. replied, "Yes." When the prosecutor asked if A.C. had been truthful when she talked to those two women, A.C. replied, "Yes."

On cross-examination, A.C. acknowledged that she met with the prosecutor three times prior to trial. She said she watched the recordings of her forensic interviews four times and watched these recordings the day prior to her testimony at trial.

A.C. said she first told her mother about the Defendant's inappropriate behavior when they were in the kitchen at the home they shared with the Defendant. Her mother asked if the Defendant was being inappropriate with her, and A.C. cried because she did not want to answer her mother's questions. A.C. said she eventually told her mother what the Defendant had done to her, but she could not currently remember what she had disclosed. Although A.C. said she thought she was five years old when she initially told her mother that the Defendant was being inappropriate, she said she continued living with the Defendant until she was six years old. A.C. said her mother and grandmother told her that they were trying to keep her safe so that the Defendant did not take her and her brother away.

A.C. acknowledged watching YouTube and Netflix when she first moved in with her grandmother. She said she now watched YouTube on her cell phone. A.C. said she used to play with her cousin, Elena, who also lived with her grandmother, but Elena did not like to play with her now because Elena was "too mature."

When defense counsel asked if she admitted that she did not tell the same story on the second interview as the first interview, A.C. replied, "In one [of the interviews], I told a lot of lies that were not true." When defense counsel asked if the lies were about whether the Defendant had been inappropriate, A.C. replied, "Yes." She clarified that she told a lot of lies in the first interview because she was "feeling uncomfortable." However, when defense counsel asked her what were the lies she told in the first interview, A.C. said she could not remember. A.C. admitted that she also told "a few" lies in the second interview but could not remember what they were. A.C. acknowledged that "some" of the lies dealt with the Defendant's inappropriate behavior, but she could not remember which ones.

When defense counsel asked if she remembered saying in the first forensic interview that she no longer lived with the Defendant because he was mean, A.C. said she did not. Defense counsel then asked, "You said things like he was mean because he was beating [your mother] up, is that right?" A.C. replied, "Yes." When asked if her claim that the Defendant was beating up her mother was the truth, A.C. responded that it was the truth.

On redirect examination, A.C. identified the recordings of her forensic interviews as well as her initials on the disk for these interviews. She stated that she looked at the recordings of her forensic interviews the prior day and put her initials on them. When asked what was on these recordings, A.C. replied, "It's the interview that I did with this woman. They also gave me these drawings." The prosecutor then introduced the recordings of the two forensic interviews for identification purposes only without an objection from the defense.

The prosecutor asked A.C. to clarify what she lied about in the forensic interviews. A.C. recalled the interviewer asking her if there were parts of her body that were not okay to be touched, and the victim said there were not, which was "a lie." The interviewer also asked her whether the Defendant touched her in those places. A.C. said she could not remember her answer but admitted that if she replied that the Defendant did not touch her on those parts of her body, that would have been a lie.

A.C. acknowledged that during her second forensic interview, she talked about the inappropriate places on her body the Defendant had touched, and she provided truthful information. She said that her uncle Anton and her mother's former boyfriend Matt had

- 9 -

never touched her inappropriately. However, she reiterated that her father, the Defendant, had touched her inappropriately.

James Scott, a detective for the Smyrna Police Department, testified that on June 6, 2019, Bratcher, the Cunninghams' neighbor, filed a police report that Victoria Cunningham told her that her daughter A.C. had been sexually abused by the Defendant. Detective Scott called and left a voicemail at the phone number Bratcher had provided for Ms. Cunningham. Ms. Bratcher also provided the police with information that Ms. Cunningham's mother was Connie Reguli. Detective James called Reguli, who confirmed that A.C., A.C.'s brother, and Ms. Cunningham were staying with her and that the kids were safe. He also called and left Ms. Cunningham a second voicemail, identifying himself and stating that he needed to facilitate a forensic interview with A.C.

Detective Scott then made a "DCS referral." He talked to DCS Investigator Tameika Gray, who informed him that Ms. Cunningham instructed her to talk to her mother, Reguli, who was the attorney who would be representing her. Investigator Gray also shared that a civil motion had been filed to prevent a forensic interview of A.C. Detective Scott then called and left a message for Reguli at her law office and left a message for Ms. Cunningham.

Detective Scott explained that when a child abuse allegation is made, he sets up a forensic interview for the victim at the CAC. He stated that the forensic interview is conducted to determine the veracity of the allegation of abuse. He noted that he would not conduct the forensic interview unless a minor victim made a disclosure of sexual abuse directly to him.

Detective Scott stated that he was never able to talk to Ms. Cunningham during his investigation. He said Bratcher came to the police department and provided screen shots of a text thread between her and Ms. Cunningham regarding this case. He asserted that Ms. Cunningham's number on this text thread was the same number he had used to call Ms. Cunningham. He later learned that there was a Juvenile Court process initiated to facilitate the forensic interview with A.C.

Detective Scott stated that on June 25, 2019, he entered a case summary noting that there had not been a forensic interview with A.C. and changing the offense from child rape to a DCS referral. He acknowledged that at that time he did not have any proof that A.C. had been raped. He asserted that the case was not closed but was pending the results of a forensic interview or the outcome of the civil litigation.

On cross-examination, Detective Scott stated that he was responsible for categorizing the case as a child rape, rather than a sexual battery or something else, because

that was what Bratcher had reported to him. Bratcher told him, based on the information she obtained from Ms. Cunningham, that the Defendant had engaged in oral sex with A.C. and had forced A.C. to engage in oral sex with the Defendant. He confirmed that despite his efforts, he never got a response from Ms. Cunningham about these allegations, which was unusual. He agreed that he did not get any cooperation from Ms. Cunningham or Reguli during his investigation.

Detective Scott stated that he was aware that DCS had filed an action to compel Ms. Cunningham to present A.C. for a forensic interview. He was also aware that Ms. Cunningham and Reguli sued DCS to prevent A.C.'s forensic interview from taking place, which he had never seen before. Detective Scott said he never got an explanation from Ms. Cunningham or Reguli about why they refused to cooperate with his investigation.

Tameika Gray, the DCS Child Protective Services Investigator in this case, testified that on June 6, 2019, she received a referral regarding A.C. She talked to Ms. Cunningham on June 10, 2019, informing her that she needed to schedule a time to meet with A.C. to discuss the allegations of child abuse. Ms. Cunningham replied that she needed to talk to Reguli, Ms. Cunningham's mother and her attorney and that she would not discuss anything with her at that time. Later that day, Reguli called Investigator Gray and stated that she would bring in A.C. the next day, June 11, 2019.

On June 11, Reguli brought A.C. and her brother to the office. Investigator Gray brought everyone to the visitation room, and she told Reguli that she needed to talk to A.C. privately to learn the basic information about the alleged sexual abuse and whether there were any witnesses to this sexual abuse. She explained that she preferred to speak privately with children because children often feel more comfortable disclosing abuse without the parents or guardian being present. Reguli refused to give permission for Investigator Gray to talk to A.C. privately, stating that she had promised A.C. she would be with her at each step of the process. When Investigator Gray told Reguli that she could watch the interview from the observation room, Reguli declined that offer and informed Investigator Gray that she would not be interviewing A.C. that day.

When Reguli asked what the next steps would be, Investigator Gray said that she would make a referral for A.C. to have a forensic interview at the CAC. Reguli then said that she did not trust the staff at the CAC because she claimed they were not well trained and that they interrogated children. She then informed Investigator Gray that she was taking A.C. to see Dr. Berryman. She asserted that if Dr. Berryman believed A.C. needed a forensic interview, then they would go to the CAC. Investigator Gray then took a photograph of A.C., and Reguli began audio recording the rest of the visit. Investigator Gray then told Reguli that they were going to stop for the day and that she would contact Ms. Cunningham for the next appointment.

- 11 -

Investigator Gray noted that on June 12, 2019, DCS attorney Matthew Wright told her that the juvenile court had issued an order requiring Ms. Cunningham to take A.C. to the CAC for a forensic interview before A.C. met with Dr. Berryman. Investigator Gray and her co-worker Chelsea Wade went to the Reguli home to deliver this court order and to conduct a home visit. When Reguli read the order, she claimed Judge Davenport was not allowed to hear any of her cases. When Investigator Gray replied that the order was directed to Ms. Cunningham and not her, Reguli asked where the "rest of it" was. When Investigator Gray replied that she had provided all the documents she had, Reguli waved her hand in a dismissive way and told them to leave her home.

Prior to delivering the court order to the Reguli residence on June 12, 2019, Investigator Gray talked to Ms. Cunningham about the scheduled forensic interview for A.C. on June 13, 2019, at the CAC. Although Investigator Gray and the forensic interviewer were present at the CAC office on June 13, 2019, A.C. never appeared.

Investigator Gray said that on June 14, 2019, Reguli filed on behalf of Ms. Cunningham and A.C. a federal lawsuit against her, Judge Davenport, and DCS attorney Matthew Wright. She acknowledged that from the initial meeting on June 11, 2019, to the day she was served with this lawsuit, she was never able to get any information from A.C. Investigator Gray stated that because of the lawsuit Reguli filed against her, she had no further involvement with this case.

On cross-examination, Investigator Gray said that when she asked Ms. Cunningham if she could meet with A.C., Ms. Cunningham refused and stated that Investigator Gray needed to talk to Reguli, her attorney, first. Investigator Gray noted that Ms. Cunningham was not present at the meeting on June 11, 2019. She said it did not make sense that Ms. Cunningham, through her attorney, refused to allow her to meet with A.C. on that date. Investigator Gray observed that although the CAC conducted forensic interviews all the time, Reguli refused to allow the CAC to do A.C.'s forensic interview prior to the court order. She also said that after Reguli demanded that she and her co-worker Chelsea Wade leave her home on June 12, 2019, Reguli called her six times in row and then four times after that, but she declined to answer those calls because the DCS attorney had instructed her not to speak with Reguli. Investigator Gray affirmed that A.C.'s scheduled forensic interview on June 13, 2019, could have taken place had A.C. appeared and that she never received an explanation as to why A.C. did not appear for her interview.

Investigator Gray confirmed that in the federal lawsuit filed by Reguli, she was sued for one million dollars. She had never been sued during her time at DCS, and the lawsuit interfered with her ability to do her job by removing her from the DCS investigation into A.C.'s case. Investigator Gray stated that this federal lawsuit was dismissed, and when

- 12 -

Reguli appealed the case to the Sixth Circuit, that court affirmed the district court's dismissal.

Sheneka Morgan, the Rutherford County lead investigator for Child Protective Services, testified that she took over this case when Investigator Gray was named in the federal lawsuit. Investigator Morgan attempted to find A.C. She checked with the Rutherford County School Board on July 17, 2019, but there was no record of A.C. being enrolled there. On July 25, 2019, she visited the Cunningham's address on file in Smyrna, but no one was at home.

On October 17, 2019, Investigator Morgan went to the CAC for A.C.'s forensic interview, but A.C. never arrived. She later received a text message from Reguli, stating that A.C. would need to come at a different time because she was on a school field trip.

On October 29, 2019, Investigator Morgan requested an order requiring Reguli and Ms. Cunningham to present A.C. for a forensic interview and requiring a home visit on November 7, 2019.

On November 7, 2019, Investigator Morgan said A.C. appeared and participated in a forensic interview, although A.C. did not disclose any sexual abuse by the Defendant. Approximately thirty minutes after the hour-long forensic interview, Investigator Morgan went to Reguli's home to conduct a home visit. When she arrived, there were no cars in the driveway, and no one answered the door. Investigator Morgan took a photograph of Reguli's residence to prove she had been there and then texted the DCS attorney to inform him that no one was home. She spent ten minutes at Reguli's home.

After Investigator Morgan left the Reguli residence on November 7, 2019, Reguli texted her, stating that she was at home but needed to get to her office. Reguli claimed Investigator Morgan was supposed to be at her home immediately after A.C.'s forensic interview, and Investigator Morgan asserted that she had done that. She then told Reguli that she needed to call the DCS attorney to talk about rescheduling the home visit. Investigator Morgan was then instructed to stop communicating with Reguli.

On November 15, 2019, Investigator Morgan said that the Defendant called to ask about the status of this case and to ask about a custodial hearing. During this conversation, the Defendant stated that he knew the victim had gone to a forensic interview on November 7, 2019, and he believed the case would be dismissed. The Defendant claimed the child abuse allegations were the result of Ms. Cunningham wanting to get a divorce on her terms and wanting to withhold the children from him. The Defendant claimed that someone had called DCS because he put Ms. Cunningham out of the home on May 28, 2019. He asserted that it was Ms. Cunningham's worst fear to have someone call DCS, and it was his worst

- 13 -

fear for sexual abuse allegations to be made against him. During this conversation, the Defendant discussed an incident involving a bath with A.C. He said he had left the home to purchase bath bombs because Ms. Cunningham and A.C. enjoyed them. When he returned, A.C. asked if he was going to take a bath with her, which caused Ms. Cunningham to get upset. Investigator Morgan noted that during this conversation, the Defendant focused on Ms. Cunningham, her behavior, and her parenting style. He claimed Ms. Cunningham would not allow him to take the children to church. He also claimed he knew famous people, but Ms. Cunningham did not want him "expos[ing] the children to that lifestyle." She said that the Defendant never expressed any concern that someone else might be abusing A.C. Investigator Morgan confirmed that she never spoke to Ms. Cunningham during her investigation, only Reguli.

On November 20, 2019, Investigator Morgan presented A.C.'s case to the Child Protective Investigative Team (CPIT), which was comprised of members of law enforcement, medical professionals, CAC, DCS, Our Kids Center, court staff, and the district attorney's office. She said A.C.'s case was classified as "allegations unsubstantiated, perpetrator unsubstantiated," which meant that there was not sufficient evidence to prove the allegations happened or to show that the perpetrator committed these allegations. She agreed that DCS closed the case because of insufficient evidence.

On cross-examination, Investigator Morgan said that although the initial focus of the investigation was on the Defendant, DCS had gotten little to no cooperation from Ms. Cunningham or Reguli.

On July 30, 2019, Investigator Morgan appeared at a hearing to discuss Ms. Cunningham's and Reguli's cooperation with DCS so it could have access to A.C. The court entered an order requiring A.C.'s custodian to present A.C. for a forensic interview. Investigator Morgan admitted it was unusual to have to obtain a court order to talk to the mother or the child where there were allegations the child was sexually abused by the father.

Investigator Morgan stated that she then had to obtain a second court order for the forensic interview that took place November 7, 2019. On that date, Reguli brought A.C. to the forensic interview, and A.C. was cooperative but did not disclose any sexual abuse. Thereafter, Investigator Morgan went to Reguli's home for a home visit, but no one was there, and Reguli blamed her for not appearing after the forensic interview and accused her of being in contempt of the court order, even though she did go to the home immediately after the interview. Investigator Morgan agreed that there was nothing preventing A.C. from telling Reguli what she said during the forensic interview.

- 14 -

Investigator Morgan stated that during the Defendant's call on November 15, 2019, the Defendant denied the sexual abuse allegations and asserted that the allegations were an attempt by Ms. Cunningham to get a divorce on her terms and to withhold the children from him. During this conversation, the Defendant told her that he asked Ms. Cunningham to leave the home on May 28, 2019, because she had been drinking excessively while taking Excedrin and Benadryl and was taking hard drugs, which he said she obtained from her maternal grandmother, Reguli's mother. He claimed Ms. Cunningham had not worked in seven years and that he had enabled her to stay home, get drunk, and do drugs. He also claimed that Ms. Cunningham was asking him for large amounts of money and did not want him to have any visitation with the children. The Defendant denied ever bathing with the children.

Investigator Morgan said that at the time of the November 15, 2019 conversation, the Defendant had not seen his children in four months, although the Defendant said he and A.C. had communicated over a video game. The Defendant also told Investigator Morgan that Ms. Cunningham, his wife, said that there was no evidence, that this would all go away, and instructed him not to let DCS into the house or to even talk to DCS. He stated that he believed the sexual abuse allegations came about because his wife was trying to inflict his worst fear on him; however, he also stated that his wife was paranoid about DCS. The Defendant disclosed that there had been some domestic issues that resulted in Ms. Cunningham's arrest, which required him to bail her out and pay for her fines, although Investigator Morgan never confirmed this information. Investigator Morgan stated despite her efforts, she was never able to talk with Ms. Cunningham.

Investigator Morgan acknowledged that A.C.'s case was classified by the CPIT as "allegations unsubstantiated, perpetrator unsubstantiated" and was effectively closed because A.C. had said that nothing happened, the Defendant had said that nothing happened, and there was no other circumstantial or medical proof of abuse at that point.

On redirect examination, Investigator Morgan acknowledged that perpetrators overwhelmingly deny allegations of sexual abuse and often blame others, just like the Defendant did in blaming Ms. Cunningham.

Lisa Milam, a social worker at Our Kids Center at Nashville General Hospital, testified that her job was to collect "a presenting history" of facts and circumstances of the alleged concern from the parent or custodian. She also prepared the child for examination and collected the child's medical history.

Milam said that on February 19, 2020, A.C. was scheduled for a forensic examination with her facility at 8:30 a.m. Prior to this interview, Ms. Milam talked to the Executive Director and the hospital's legal team, informing them of her history with

Reguli, that Reguli had issued subpoenas for Milam several times on behalf of her legal clients, and that Reguli had filed a lawsuit against her, a nurse practitioner, and several dozen other people. Milam informed Ms. Cunningham of her history with Reguli and offered to make a referral to a different provider, but Ms. Cunningham agreed to have the forensic examination done at Our Kids Center.

Milam noted that although A.C.'s appointment was at 8:30 a.m., Ms. Cunningham and A.C. arrived at Our Kids Center at 9:15 a.m. She said Ms. Cunningham seemed "upset" and "kept saying that she wanted to leave." She told Milam that she did not want to share any information and just wanted Milam to take A.C. for the forensic examination, so they could leave.

Milam told Ms. Cunningham that she needed to speak to A.C. privately to get her medical history because a parent's presence often limited the information shared by the child, and Ms. Cunningham refused to give permission for Milam to speak privately with A.C. When Milam offered to collect as much information as she could from Ms. Cunningham, to conduct exam preparation with A.C., and then proceed with the exam, Ms. Cunningham appeared to agree to this. However, Milam left the room to get the nurse practitioner, and when she returned, Ms. Cunningham had left the examination room and had gone to the lobby to speak on the phone. Ms. Cunningham then informed her that she had consulted with her attorney and had decided not to proceed with A.C.'s appointment. Milam then told Ms. Cunningham that she could reschedule A.C.'s appointment with Our Kids Center or could get referral information for other providers.

On cross-examination, Milam said Our Kids Center's primary concern was to conduct a medical examination, to document anything observed, to conduct lab testing, and to ensure that the child received proper medical care. She confirmed that Reguli filed the lawsuit against her six or seven years prior and that she believed this lawsuit had been dismissed. Milam said she had never been sued before or since then.

Milam stated that before Ms. Cunningham stopped A.C.'s appointment, Ms. Cunningham disclosed that they were there because the Defendant had touched A.C. She also said that she and the Defendant were in the middle of a divorce and that she wanted A.C.'s examination to be completed so she could leave. Milam acknowledged that Ms. Cunningham's decision to cancel A.C.'s appointment presented issues because generally the sooner the examination occurs, the better.

Jill Howlett, a social worker at the Our Kids Center in Nashville, testified that she participated in an appointment with A.C. at the center on October 5, 2020. At the time, A.C. was seven years old and "seemed like a typically developing" seven year old, who was able to answer questions and communicate clearly. She stated that Ms. Cunningham

brought A.C. to the appointment and was cooperative. Howlett said A.C. provided her with her medical history.

During this appointment, A.C. disclosed that the Defendant had touched her "lady parts," referring to her genital area, with "his parts," referring to the Defendant's genital area. When Howlett asked whether the Defendant's part stayed inside or outside her lady parts, A.C. said she did not know. Howlett asked A.C. whether the penile/genital contact occurred one time or more than one time, and A.C. stated that it happened more than one time. When Howlett asked if anything else had happened, A.C. replied that the Defendant "licked" her lady parts, and that this occurred more than one time. When Howlett asked if the Defendant touched her lady parts with anything else, A.C. said, "[N]o."

Howlett then asked A.C. if she had been required to touch the Defendant's body in any way, and A.C. replied, "[H]e made me. I didn't want to." A.C. specified that the Defendant made her touch his penis with her hand and that this occurred "a lot of times."

When Howlett asked if anything else had happened, A.C. said that sometimes the Defendant made her put her mouth on his penis. She also said the Defendant sometimes put her feet on his penis.

When Howlett asked if A.C. ever saw anything come from the Defendant's body following sexual contact, A.C. responded that "weird stuff came out." She described this substance as white, but she did not know what it was. She said the Defendant "lick[ed] it up. When she asked if anything else happened with the Defendant, A.C. stated that she did not think so. A.C. reported that she had never experienced any type of sexual contact with someone other than the Defendant.

Howlett said A.C. did not seem to be under duress or coercion during the appointment. She noted that A.C. was "willingly able to join [her] and was able to talk without any issues." She said that the remainder of A.C.'s appointment was "[u]neventful."

On cross-examination, Howlett acknowledged that at the October 5, 2020 appointment, Ms. Cunningham and A.C. were accompanied by Reguli. However, Howlett stated that she only spoke with Ms. Cunningham and A.C. and did not speak to Reguli. Howlett stated that she knew of Reguli but had not been sued by her.

Lori Littrell, a nurse practitioner at Our Kids Center, was accepted as an expert in pediatric forensic evaluations. She stated that the "hymen myth" was that if an object entered the hymen, there would be an injury but that in reality, "something c[ould] go inside [the hymen] and not cause any injury." She said that even if there is an injury to the hymen membrane, it can "heal completely and very quickly." Nurse Practitioner Littrell asserted

- 17 -

that many children do not disclose sexual abuse immediately, and because they are evaluated later, it is common to see no visible injury to a child during a physical examination. She also noted that a child could disclose that penetration occurred, but the object could have not gone all the way through the hymen into the vagina.

Nurse Practitioner Littrell examined A.C. on October 5, 2020. Based on the information provided by Ms. Cunningham, Nurse Practitioner Littrell knew the last possible sexual contact between A.C. and the Defendant was during a supervised visit two to three days earlier. She said she did not make any findings after A.C.'s physical exam because the exam showed that A.C. was healthy and had no injuries. She was aware that A.C. provided in her medical history to Howlett that the Defendant had touched her lady parts, that the Defendant's "parts touched [her] lady parts," that the Defendant put his tongue inside her lady parts, and that the Defendant made her touch his "part" with her hand or her mouth. Nurse Practitioner Littrell stated that A.C.'s physical examination was consistent with the medical history A.C. had given Howlett.

Nurse Practitioner Littrell received some medical history regarding A.C. from Ms. Cunningham, who stated that A.C. had not been exposed to sexually explicit materials. She explained that nurses ask this question because there are mental health repercussions for children who have been exposed to sexual images.

On cross-examination, Nurse Practitioner Littrell acknowledged that while many children will have no physical findings following penetration, approximately seven percent will have physical findings showing injury to their genital area. However, she added, "The lack of injury does not mean [sexual abuse] did not happen." She noted that A.C.'s hymen did not have any notches or tears. She also noted that the area inside A.C.'s vagina and anus did not show any bruising, tears, or bleeding. She asserted in her report that the lack of injuries in "no way rule[d] out the possibility of child sexual abuse." She noted that ninety-three percent of exams showed no signs of injury. Nurse Practitioner Littrell stated that A.C. tested negative for sexually transmitted diseases.

Nurse Practitioner Littrell agreed that there were no physical findings of sexual abuse of A.C. However, she stated that based on her examination, she could not say whether sexual abuse "occurred or did not occur."

Elizabeth Benton, a forensic interviewer at the CAC, testified that she conducted the forensic interviews of A.C. on November 7, 2019, and February 10, 2020. She asserted that A.C. did not appear to be under coercion during either of these forensic interviews. The videos of the forensic interviews were introduced without objection from the defense, were played for the jury, and were admitted into evidence.

At the November 7, 2019 forensic interview, A.C. said she was six years old and that her grandmother Gabby had brought her to the interview. She said that she no longer lived with her dad because "he was mean to mommy" by beating up on her. She said her mommy would "cry" and she "would hide." She also said she did not feel safe at the house because her father was mean to her brother. A.C. stated that one time her dad wanted to go to Disneyland with just her. A.C. said she felt like something bad would happen to her at the old house, and she would have bad dreams. She said that she and Mommy and her brother "ran away" from the old house. When asked if she had places on her body that were not okay to touch, A.C. did not respond. She said that something happened "a long time ago" when she was living with her dad. When she was asked what happened, A.C. did not respond. When she was shown anatomical drawings of a girl, A.C. identified the vaginal area as "private" and the buttocks as "butt." On the anatomical drawings of the boy, A.C. identified the groin as "private" and the buttocks as "butt." When asked if she ever got touches that were not okay, A.C. said, "No." A.C. said it was not okay to get touched on the "private" of the girl and boy. When asked if anyone had ever touched her on her "private," she shook her head "no." When asked if anyone had ever made her touch the "private" part on a boy, she shook her head "no." A.C. said that if she needed to talk to someone about anything, she could talk to Dr. Janie Berryman, her mother, and her grandmother "Gabby."

At the February 10, 2020 forensic interview, A.C. stated that she was seven years old and that on the way to the interview, she had talked to her mother about her dad "being inappropriate" and doing "bad stuff that he's not supposed to do." She then stated that her dad had been "putting his privates in mine." She said her father put his privates in her legs and in her privates. A.C. said, "Sometimes he pushes hard, and I don't really like it." She then said I "push him a little bit" with "sometimes my feet" and "sometimes my hands." A.C. said that sometimes her father told her to "cross my legs" and he would put "his privates through [her] legs." She said this happened "more than one time" and "almost a million times." A.C. said that the first time this happened, she wanted to ask him how it happened but she was "too scared." She said her father first did this when she "was a baby." She remembered one time her father "took a shower" with her "when she was a baby," but now her father cannot do that "because it's inappropriate." She said the last time her father put his privates into her privates was "at an old house" but she did not know who owned the house. When she was asked where the inappropriate things happened, she stated, "I don't really remember when it happened, and I'm really telling the truth." A.C. stated that she was currently in kindergarten, that her dad's behavior happened during kindergarten, and that she "didn't really tell anyone" because she "thought he would be really mad." She said her dad kicked her mom out of the house, and her mom took her and her brother away because her father was "being inappropriate." She said her mother "would always catch us" and her dad did not like it so he would "hide under the blanket." She said this occurred at their "old house" in her mom and dad's room. She said her mom

did not see anything but she knew "inappropriate" things happened because A.C. and her father were under the blanket together. Specifically, she said her father would "lick her privates" by putting his "tongue on it." She said this happened more than one time and that her father "did a lot of things more than one time." She also said her father tried to make her put her tongue on his privates but she did not do it because she was watching a movie.

When Elizabeth Benton asked her what she called those body parts that her dad "pushes hard" on, A.C. said "he only uses his privates" and then Benton asked her what she called those private parts, and A.C. said "winky." When Benton asked her what body part a "winky" was, A.C. was unsure, and Benton showed her the anatomical drawings of a girl and a boy from her first forensic interview. When she asked her what was a "winky," A.C. pointed to the boy's penis on the anatomical drawing. Benton said that A.C. had previously stated that her dad "pushes hard sometimes" and then pointed to two body parts, and she asked A.C. to identify these areas on the anatomical drawing. A.C. then pointed to the girl's vaginal area and buttocks on the anatomical drawings. Benton asked what her dad does when he "pushes hard," and A.C. pointed to the boy's penis and said her dad puts his penis in her vaginal area and buttocks and then pointed to these areas on the anatomical drawings of the girl" Benton asked how it felt when her dad puts his "winky" in her buttocks, and A.C. said, "It hurts." Benton then asked what it felt like when her dad put his "winky" in her vaginal area, and A.C. said, "It also hurts." When Benton asked where exactly her dad put his "winky" when he puts it in her vaginal area, A.C. replied that her dad put it "where girls go potty . . . like go pee pee."

When asked if she had ever seen anything come out of her dad's "winky," A.C. said that it was "this really gross stuff I don't really like" that was "kind of like whitish yellow." She said one time her dad "licked" this substance off her "chest" even though she didn't think it was "really good or something to drink." She also said her father told her to "cross" her "legs," as she pointed to the upper legs on the girl's anatomical drawing, and then she said he "pushes" with his penis, as she pointed to the penis on the boy's anatomical drawing. A.C. stated that when this happens, she still did "not like it." Benton asked how many times he put his "winky" here, pointing to the buttocks on the girl's anatomical drawing, and A.C. said her father put his winky in her butt "like forty-six times." When Benton asked if there was one her dad did more than the other, A.C. pointed to the penis and vaginal areas on the anatomical drawings and said that her father put his privates in her vagina "the most" and this happens when her legs are "crossed and not crossed" and that her legs were "mostly" crossed when the "yucky white/yellow stuff comes out." She said that the "yucky white/yellow" stuff only got on her "chest one time," and the rest of the time it got on the bed.

She said her dad "trie[d] to be funny" and "hit" her in the "face" with his "privates," and pointed to the penis on the anatomical drawing. Benton asked her to show on the

drawings where her dad's "winky" goes when her legs are crossed, and A.C., pointing to the girl's vaginal area on the anatomical drawing, said her dad's winky would go "almost where [she] goes pee pee" and that when her legs were not crossed, her dad's winky would go in "the hole" where she "goes tinkle." A.C. said that she did not talk about these things the last time she met with Benton because Benton "did not ask [her] about this."

A.C. told "Dr. Janie" about her dad being inappropriate because her "mom wanted" her "to tell because if [she] didn't tell anyone, it would just keep going, and it would never stop." She said her mom knew about what her dad was doing because "she would always see." She said the "first time" her mom talked to her about it, her mom told her to "never lie" and that "what [her mom] meant" was that if her dad "was inappropriate," A.C. "should tell the truth" A.C. said her mother then asked if her dad was "being inappropriate," and A.C. "said yes." She said her mom asked her this at their "old house."

A.C. asserted that her dad was "inappropriate" because he "likes it" and that he "does it at night" when she sleeps with him "at their old house." When she told her mom about her dad continuing to be inappropriate, her mom got "mad" and her mom would "tell[] her mom." She said that if her dad was inappropriate when she visited him, she would tell her mom about it "in the car" when her mom picked her up. She said her dad was not inappropriate to her brother because he "is a boy." A.C. noted that during her visitations with her dad, she would sleep in her "mom and dad's bedroom," but her brother would sleep in their "old room." A.C. said that if something else happened, she would tell Dr. Janie Berryman, Elizabeth Benton, her mom, or her grandmother "Gabby."

Benton noted that after A.C.'s first forensic interview took place, the CPIT determined that A.C.'s case was "unsubstantiated." However, she said a new case involving A.C. was opened after A.C.'s second forensic interview, which was substantiated.

On cross-examination, Benton asserted that it was important to conduct a forensic interview as soon as DCS or law enforcement learned that abuse has occurred because a child's memory is better close in time to when the abuse occurred. She also noted that it is important to conduct a forensic interview as soon as possible to prevent outside influences from shaping or changing a child's statements.

On redirect examination, Benton stated that no disclosure from a child does not necessarily mean that no abuse occurred. She agreed that she has had other cases in which a child does not immediately disclose abuse and then later discloses that abuse occurred. Her experience was that children disclose sexual abuse when they are ready to disclose it and not before.

Dr. Janie Berryman testified that she had a doctorate in Counseling and Psychology and had been working for the last thirty years as a psychologist, assessing people for ADHD and mental health issues and counseling children who had been abused. She stated that she had worked at the Comprehensive Child Abuse Program at Luton Mental Health, now known as Centerstone, and had worked at Our Kids Center counseling kids from the time they came into the clinic until they got a regular therapist. Dr. Berryman had initially gotten to know Reguli through the court system and had known her for many years. She said they had worked on cases together and had also been on opposing sides in legal cases. She categorized her relationship with Reguli as "[p]rofessionally friendly."

Dr. Berryman first saw A.C. as a client because A.C.'s parents were getting a divorce. She acknowledged that there were "some red flags, earlier on, about some possibly inappropriate behavior, but that kind of was not the focus at the time." Initially, her goal was to get A.C. to talk about her feelings and provide her with some tools to navigate her parents' divorce. Dr. Berryman acknowledged that she was A.C.'s therapist, which is more child focused with the child guiding the process, and that she did not serve as a forensic interviewer, which would have required her to ask questions to determine whether abuse happened.

Dr. Berryman said that in June 2019, Reguli contacted her and asked her to conduct a forensic interview on A.C. Dr. Berryman knew that DCS would have to conduct the forensic interview, so she informed her of that. Dr. Berryman only began to see A.C. after A.C. scheduled her initial forensic interview. Dr. Berryman said that it was common for parents to delay taking their child for a forensic interview because the parents were in denial that their child had been sexually abused.

Dr. Berryman met with A.C. twenty-one times from October 8, 2019, through November 3, 2020. She knew, from the very beginning of taking A.C. on as a client, that a DCS referral had been made. During an October 16, 2019 session, Dr. Berryman asked A.C. why she thought she was staying with her grandmother, and A.C. replied, "[B]ecause my dad keeps beating my momma and we've ran [sic] away." A.C. said that the Defendant had kicked her mother on several occasions, which "scared" her. However, she said the Defendant never hit her. A.C. stated that the Defendant "does what he wants" and that "[h]e wanted to take me to Disney, only take me" but "Mom want[ed] us to go as a family." A.C. explained that the reason they left the home was because her father "wasn't doing something right." When Dr. Berryman asked what her father was doing, A.C. responded, "It's not really for kids." A.C. then got quiet. A.C. and Dr. Berryman agreed to talk more on another day.

During a session on October 29, 2019, Dr. Berryman asked what A.C. thought about talking to her father, and A.C. said that the Defendant "lie[d] all the time" and that the

Defendant did not want to get in trouble. When Dr. Berryman asked why the Defendant was in trouble, A.C. responded, "He was inappropriate with me." Dr. Berryman asked what was inappropriate about what the Defendant was doing, and A.C. replied, "It's hard to talk about." She noted that A.C. was "very avoidant," so Dr. Berryman started asking questions about A.C.'s brother.

During a November 20, 2019 session, Dr. Berryman asked A.C. how she felt about the Defendant, and A.C. replied, "I don't know." She then asked whether A.C. had any secrets, and A.C. stated, "I'm still not ready to talk about it."

During a session on December 3, 2019, A.C. stated she and her brother had been visiting with just the Defendant. Dr. Berryman noted that A.C. was not very talkative and was "somewhat avoidant" during that session.

Dr. Berryman stated that she had a December 10, 2019 session with the Defendant. During that session, the Defendant stated that Ms. Cunningham was afraid of DCS and would not let anyone from DCS come to their home. He also claimed that Ms. Cunningham had "called him out" on Instagram, telling people he was "sleeping with" A.C. He noted that on May 28, 2019, Ms. Cunningham left his home with the kids. The Defendant also stated that on that day, "they had bath bombs," and A.C. asked him to take a bath with her, but he did not. He said Ms. Cunningham later "blew up" at him because she believed that he wanted to take a bath with A.C. Dr. Berryman recommended that the Defendant not sleep in a bed with A.C., "given the allegations because it was risky," but the Defendant replied, "I'm not gonna [sic] give in to their allegations." The Defendant seemed most focused on his conflict with Ms. Cunningham.

During a December 18, 2019 session with the Defendant, the Defendant told Dr. Berryman he was in a "better mood." He claimed his son wanted to live with him, and A.C. wanted the family back together. The Defendant also shared that at some point Ms. Cunningham had been arrested, and she stopped drinking for a time but resumed drinking on a trip to the beach.

At a December 23, 2019 session immediately prior to Dr. Berryman's session with A.C., Ms. Cunningham said the Defendant had slept in the bed just with A.C. during the previous two visits. However, Ms. Cunningham also stated that the kids seemed to have fun during the visitations. Dr. Berryman noted that A.C. was "avoidant" that day and did not talk at all.

At a session on January 23, 2020, A.C. told Dr. Berryman that she was embarrassed because her parents fought in front of her dance group. She said her father "mostly starts it."

During a session with A.C. on February 4, 2020, A.C. provided information that resulted in Dr. Berryman making a referral to DCS. Dr. Berryman said that at first, Ms. Cunningham disclosed that the Defendant had been given his first unsupervised overnight visit with A.C. Dr. Berryman asked A.C. if anything "not so good" had happened, and A.C. said everything was good. When Dr. Berryman asked what was good, A.C. stated that "something had happened." When Dr. Berryman asked if the Defendant had been inappropriate with her, A.C. responded that she was not ready to talk about it. When Dr. Berryman encouraged her to open up about what happened, A.C. stated, "He was doing, that was bad, he put his private in me." Dr. Berryman asked if the Defendant had told her to tell or not tell people about his behavior, and A.C. said the Defendant told her, "Don't tell." Dr. Berryman stopped the session to call DCS about A.C.'s disclosure. She acknowledged that the Defendant's unsupervised overnight visitation with A.C. occurred a few days before she saw A.C. on February 4, 2020. She said neither Ms. Cunningham nor Reguli had contacted DCS to make a referral from the time that A.C. got picked up from this supervised visitation to A.C.'s February 4, 2020 appointment with her.

Dr. Berryman was not surprised that Ms. Cunningham and Reguli had not contacted DCS. She claimed that neither Ms. Cunningham nor Reguli trusted DCS workers to do their jobs properly and that Reguli had often stated her distrust of DCS over the years.

At a February 13, 2020 session, A.C. told Dr. Berryman that she was scheduled to go to Our Kids Center the following week. Dr. Berryman asked if A.C. was ready to discuss the Defendant's inappropriate behavior, and A.C. said she was. She asked how old A.C. was the first time the Defendant was inappropriate, and A.C. replied, "Five, six, then seven." When Dr. Berryman asked whether this inappropriate behavior happened more than 5 times or more than 10 times, A.C. responded, "More than 10. It was 20 thousand times." Based on her experience with children, Dr. Berryman knew that A.C.'s statement that it happened "20 thousand times" meant that the Defendant's inappropriate behavior happened "[a] lot." Dr. Berryman stated that if a child said something happened a million times, the child was not intentionally trying to mislead; instead, the child was trying to explain that something happened numerous times. During this session, A.C. also stated that she told the truth in the forensic interview and was worried that her father would be mad at her for telling.

At the February 20, 2020 session, A.C. was in a good mood. A.C. stated that she felt better after she disclosed "what happened with [her father]."

Dr. Berryman said that there was a five-month gap in her sessions with A.C. At a session on August 6, 2020, A.C. told her that the Defendant was not going to discuss the inappropriate "stuff" and that it was hard for the Defendant to be honest. Dr. Berryman

said that by that session, the visitations with the Defendant had stopped, and a restraining order had been put in place. A.C. said that she did not miss the Defendant and that the Defendant would beat up on her mother. A.C. described one incident when she got out of bed and saw the Defendant hit her mother and push her against the wall hard. A.C. observed holes in the wall, and the Defendant blamed it on her mother. A.C. stated that the Defendant only cared about her and not her brother. She also said the Defendant was only nice to her and spanked her brother hard, although he never spanked her.

At the session on August 18, 2020, A.C. told Dr. Berryman she hated the Defendant because he did "terrible stuff." A.C. said, "When he's inappropriate, he hurts me, but I don't tell him."

At the session on September 3, 2020, A.C. told Dr. Berryman that she believed the Defendant was "born in hell." When Dr. Berryman asked if A.C. had heard an adult say that about her father, A.C. said she said that because the Defendant was mean to everyone in the family except for her. A.C. stated that the Defendant bought her and her brother toys so they would love him and not their mother. Dr. Berryman said that once A.C. had disclosed the Defendant's inappropriate behavior, A.C. focused on the Defendant's domestic violence.

Dr. Berryman said she reviewed a video recording pretrial where A.C. and her brother excitedly ran toward the Defendant at the beginning of a supervised visit. When asked if this video would in any way discredit A.C.'s disclosure of sexual abuse, Dr. Berryman replied, "No. . . . Parents are parents. Kids love them because they are their parents." She also said that "at this point, there's a lot of eyes on what's going on," and "everybody's on their best behavior."

On cross-examination, Dr. Berryman said Reguli first reached out to her in in June 2019, which was after a neighbor reported the Defendant's abuse of A.C. At the time, Reguli wanted Dr. Berryman to conduct A.C.'s forensic interview, but she declined. Dr. Berryman was aware, as of the time of trial, that Reguli's law license had been suspended and that Reguli had been either charged with or convicted of a felony. She acknowledged that Reguli helped Ms. Cunningham pay $150 per hour for each therapy session.

At the intake meeting for A.C. on October 8, 2019, she was aware that a forensic interview of A.C. had been scheduled and later discovered that it did not take place. She did not recall whether Reguli or Ms. Cunningham told her why they cancelled the forensic interview. Dr. Berryman contacted DCS to inform them that she was working with A.C. She also knew that Reguli sued Tameika Gray. Dr. Berryman said that she had never been sued by Reguli, although she was aware that Reguli had sued other individuals. Dr.

Berryman said that Reguli thought of her as "one of the few mental health people she trust[s]."

Dr. Berryman said that from the very beginning, Ms. Cunningham and Reguli informed her about the sexual abuse allegations against the Defendant. She said they believed the Defendant had sexually abused A.C. because they saw A.C. as a "truthful kid." She did not recall asking Ms. Cunningham or Reguli whether they had taken A.C. to the doctor following her disclosure of sexual abuse.

Dr. Berryman said it was "not uncommon at all" for a parent to wait four and a half months to meet with a therapist, to conduct a forensic interview, or to take the child to Our Kids Center because "[a] lot of people are in denial." However, she acknowledged that Reguli contacted her in June 2019 to do a forensic interview on A.C. She stated her belief that it was okay for a parent to wait for a medical exam, "unless the child is complaining of pain or [having] medical complications."

Dr. Berryman said she was aware that A.C. had not made a disclosure during the first forensic interview on November 7, 2019. She said it was not unusual for a child to go "in with a stranger they've never met, for a 30-45[-]minute interview" and not disclose abuse.

She admitted that the Defendant agreed to meet with her, even though he did not have to do that. She also acknowledged that Ms. Cunningham was granted a restraining order to keep the Defendant away from A.C. However, she said she was not aware of Ms. Cunnigham's decision two days later to dissolve that restraining order.

During her session with the Defendant on December 10, 2019, Dr. Berryman did not ask him specific questions; instead, she asked him to tell her what was going on and the history. The Defendant claimed that his wife would drink during the day with the kids there, that his wife was raped at age twelve, that his wife was arrested in February 2016, and that Ms. Cunningham's grandmother believed Ms. Cunningham was taking her medication from her leg amputation. Dr. Berryman said she did not check if any of this information about Ms. Cunningham was true because she was not evaluating the parents and was working as A.C.'s therapist. When asked if she wanted to talk to Ms. Cunningham about these issues, Dr. Berryman said that Ms. Cunningham was "very uncomfortable with the whole therapy process," and she "did not push her on things." In addition, she claimed that A.C. never talked about her mother drinking, etc., and that if she had, she would have followed up on these issues mentioned by the Defendant. Dr. Berryman said that when the Defendant had sessions with her, he was having visitation with his children.

- 26 -

Dr. Berryman said that the first time A.C. mentioned any sexual abuse to her was during a session on February 4, 2020. Dr. Berryman stated that at intake, in a separate room, Ms. Cunnigham told her that the Defendant had posted some "sexualized" photographs of A.C. on Facebook after his visitation with the kids and that Ms. Cunningham could tell something was not right because of A.C.'s demeanor in the photos. Ms. Cunningham noted that her son said he had slept alone, but the Defendant slept with A.C. Ms. Cunnigham said she asked A.C. if the Defendant was good, and A.C. replied that the Defendant had been "inappropriate" and had "touched [her] private" area through her clothes while he touched his own private while naked. Ms. Cunningham told Dr. Berryman that A.C. did not want to elaborate further, but A.C. later told Reguli that the Defendant "made her cross her legs and put his penis between them." Dr. Berryman said that she did not instruct Ms. Cunningham to call the police; instead, she allowed Ms. Cunningham to tell her what was going on, and then she met with A.C. to figure out what to do next. Dr. Berryman did not ask Ms. Cunningham if she had called DCS or taken A.C. to a medical provider. Dr. Berryman acknowledged that when Ms. Cunningham had gone through this same process nine months prior, she had failed to take A.C. to a medical provider.

During this February 4, 2020 session, Dr. Berryman then met with A.C., who told her that the Defendant "was inappropriate." A.C. then said, "He was doing something . . . that was bad. He put his privates in mine." A.C. also said the Defendant told her not to tell anyone. Dr. Berryman acknowledged that Ms. Cunningham had said something different about the Defendant's abuse of A.C. Dr. Berryman said that A.C. may have told her more than she told her mother about what happened. She said it was up to the forensic interviewer to determine what happened, and she passed it on to DCS to handle A.C.'s forensic interview and told Ms. Cunningham to follow DCS's recommendations. Dr. Berryman said she wrote a September 3, 2020 letter to the court recommending that it suspend the Defendant's visitation, which the court did. In this letter, she specifically asserted that the Defendant's children were "expressing anger," did not want to see their father; she stated that it was her belief that "[c]ontact at this time, even supervised[,] is not in their best interest."

Dr. Berryman acknowledged that after seeing A.C. on February 20, 2020, over five months went by before seeing A.C. again. Her explanation for this five-month gap was that when visitations with the Defendant stopped, A.C. was fine because "everything bad had been stopped."

Dr. Berryman said that, a few days after she sent the September 3, 2020 letter, she testified at a hearing before Judge Scarlett in the juvenile court case, where A.C., personnel from the CAC, Elizabeth Benton, and Ms. Cunningham also testified. Following this hearing, the court granted the Defendant supervised visitation with his children. Dr. Berryman was "horrified" with this decision because A.C. had disclosed her deepest secret,

and the court said "okay, you're gonna [sic] see your perpetrator now." She knew that at the time of the hearing, Ms. Cunningham had not taken A.C. to Our Kids Center for a physical examination, even though Ms. Cunningham made sure that A.C. received several therapy sessions. She stated, "I don't know that there w[ere] any medical concerns at that time to rush the child to the doctor."

Dr. Berryman stated that once the Defendant was indicted in November 2020, the Defendant's contact with his kids stopped. At that point, A.C.'s therapy also stopped. She noted that ultimately the parent decides whether therapy continues.

A video of A.C. and her brother greeting the Defendant after not seeing the Defendant for eight months was shown to the jury. Dr. Berryman acknowledged that this recorded visitation took place just a few days after she sent her September 3, 2020 letter to the court, stating that the children did not want to see their father and that she believed that "[c]ontact at this time, even supervised[, was] not in their best interest." She agreed that the Defendant was indicted within a month of the date that this visitation took place.

On redirect examination, Dr. Berryman confirmed that she was present for the testimony that A.C. gave in chambers to Judge Scarlett in the juvenile court. She stated that she had just reviewed the transcript from A.C.'s testimony in chambers with Judge Scarlett. Dr. Berryman stated that she was present for and witnessed A.C.'s testimony, explaining that she was "in the outside room, but . . . could hear everything being said." When she was asked if there was anything about the transcript that appeared inaccurate, Dr. Berryman replied, "It looks accurate."

Dr. Berryman stated that during this in-chambers hearing before Judge Scarlett, A.C. testified that the Defendant "would lick her down there." During cross-examination, A.C. "was consistent in saying something inappropriate happened." When A.C. was asked if anyone had told her what to say, A.C. replied that no one had told her what to say. She stated that A.C. was "consistent" during the in-chambers hearing that her father had been inappropriate with her.

On recross-examination, Dr. Berryman agreed that the Defendant also testified in the hearing before Judge Scarlett. She acknowledged that despite her own testimony and A.C.'s testimony at the in-chambers hearing, Judge Scarlett still granted supervised visitation to the Defendant.

The Defendant did not present any proof on his behalf.

At the conclusion of trial, the jury convicted the Defendant as charged of seven counts of rape of a child and six counts of aggravated sexual battery. Following a

sentencing hearing, the trial court sentenced the Defendant to thirty years for each conviction in Counts 1 through 7. See id. §40-35-112(b)(1). It also imposed a sentence of ten years for each conviction in Counts 8 through 13. See id. §40-35-112(a)(2). The trial court then ordered Counts 1 and 2 served concurrently, Counts 3 and 4 served concurrently, and Counts 5 and 6 served concurrently before ordering Counts 1 and 2, Counts 3 and 4, and Counts 5 and 6 served consecutively to one another. The court also ordered Counts 8 through 13 served concurrently with one another but consecutively to the sentences in the rape of a child counts and ordered Count 7 served concurrently with Counts 1 through 6 and Counts 8 through 13, for an effective sentence of 100 years.

Thereafter, the Defendant timely filed a motion for new trial. He later filed an amended motion for new trial, alleging that the evidence was insufficient to sustain his convictions, that the trial court erred in preventing him from taking further depositions without leave of that court, that the trial court erred in failing to compel the State to provide complete and full transcripts of A.C.'s purported testimony that occurred in chambers before Judge Scarlett in the divorce case, that the trial court erred in not compelling the State to provide the identity of the court reporter who transcribed this A.C.'s purported testimony, that the transcript excerpt of A.C.'s purported testimony was not properly authenticated because it did not disclose the identity of the court reporter, that the trial court erred in permitting the videos of the forensic interviews to be played in full for the jury, that the trial court erred in permitting introduction of the Defendant's prior bad acts, that the trial court erred in applying enhancement factors 7 and 15, that the trial court erred in failing to give the proper weight to mitigating factors during sentencing, and that the trial court erred in sentencing the Defendant to consecutive sentences. The Defendant filed a premature, but timely, notice of appeal. See Tenn. R. App. P. 4(d). The trial court then entered an order denying the motion for new trial.

## ANALYSIS

**I. Forensic Interview.** The Defendant argues the trial court erred in admitting the video recording of A.C.'s second forensic interview pursuant to Code section 24-7-123. He claims the second forensic interview lacks trustworthiness because A.C. never testified, under oath, that the offered interview recording was a true and correct recording of the events contained therein as required by Code section 24-7-123(b)(1). In addition, he asserts that A.C. admitted several times at trial that she lied during her forensic interviews and that she specifically lied about things involving the Defendant during her second forensic interview. Although the Defendant concedes that he waived plenary review of this issue by failing to make a contemporary objection, he nevertheless contends that the trial court committed plain error in admitting the second forensic interview.

- 29 -

In response, the State contends that the Defendant waived review of this issue by failing to make a contemporaneous objection and by failing to raise this issue in his motion for new trial, and that the Defendant failed to establish that admission of the second forensic interview was plain error. We agree with the State.

Prior to trial, the State filed a motion for admission of A.C.'s second forensic interview, which was conducted on February 10, 2020. Thereafter, the Defendant filed a motion for admission of A.C.'s first forensic interview, which was conducted on November 7, 2019.

At the pretrial hearing on these motions, the prosecutor asserted that this first forensic interview did not fall under Code section 24-7-123 because the victim did not make a disclosure of sexual abuse during the first interview. Nevertheless, he said he intended to introduce the videotapes of A.C.'s first and second forensic interviews "one after another" so the evidence could fairly be presented to the jury. He also said he would introduce the first interview "under the same methods" that he introduced the second interview. When the court asked defense counsel if he had any objection to the admission of both interviews, defense counsel responded, "I will agree with the State, that if the second interview is going to come in, [it] certainly makes sense both in timing and context to have the first one come in as well." Defense counsel confirmed that he had no objection to the State's laying the foundation for the first interview pursuant to Code section 24-7-123. Defense counsel also stated that the parties had "stipulated" that the recording of the first forensic interview "need[ed] to come in."

At this pre-trial motion hearing, the State called Elizabeth Benton, the forensic interviewer, to testify. Benton testified that she was a forensic interviewer at the CAC in Rutherford County, which was compliant with the criteria in Code section 9-4-213. She confirmed that she conducted forensic interviews with A.C. on November 7, 2019, and February 10, 2020, that were recorded, and the recordings of the forensic interviews were entered into evidence at the hearing.

On cross-examination, Benton stated that during the November 7, 2019 interview, A.C. did not make a disclosure, but at the February 10, 2020 interview, A.C. did make a disclosure of sexual abuse. She said she was not aware of divorce proceedings between A.C.'s mother and the Defendant and did not "have any opinion as to whether there was [bias or coercion used to influence]" A.C. by her family, who brought A.C. to the interviews. However, Benton stated that she did try to clarify whether there had been any coercion by asking A.C. if anyone had talked to her about coming to the interview. She stated that her job was not to investigate but to "talk with the child," which meant that she did not do an independent investigation regarding the circumstances of the parents' divorce, the custody arrangements, or the animosity between the parents.

On redirect examination, Benton confirmed that A.C. was able to provide specific details regarding the sexual abuse during the second forensic interview.

At the end of this hearing, the trial court held that Elizabeth Benton met the qualifications of Code section 24-7-123(b)(3) and that the court was "reasonably satisfied that the video recording[s] possesse[d] particularized guarantee[s] of . . . trustworthiness, specifically based [on] cross-examination questions." It noted that the cross-examination focused on Code sections 24-7-123(b)(2)(B) and (I), and the court determined that these two subsections had been met. The court did not find that A.C. had any motive to have "falsified or distorted [the] event[s]." The trial court also noted that Benton did not have any information about the relationship of A.C. to the Defendant. Ultimately, the court found that the recordings of both the first and second forensic interviews had guarantees of trustworthiness.

At a hearing immediately prior to trial, the prosecutor reiterated his belief that the first forensic interview did not fit with Code section 24-7-123 "because there was no sex abuse disclosed." However, he said the first forensic interview could be considered by the jury "as a prior inconsistent statement for [the] purposes of evaluating [A.C.'s] credibility." The prosecutor noted prior inconsistent statements are "used for impeachment purposes" but are not admitted as substantive proof and are not entered as an exhibit. He added that he fully anticipated that the State would "play that first forensic interview in its entirety" and the jurors would "have a copy of a transcript in their hands" while the State played the "first forensic interview in its entirety[,]" but he questioned whether the first forensic interview should be admitted as an exhibit.

Defense counsel countered that the State had agreed last week that both the first and second forensic interviews would be played for the jury and admitted as evidence and that the State was now backing away from its agreement. The trial court reminded counsel that it made "all evidentiary rulings" and that if the State moved the first forensic interview in for identification only, then the defense could object, and the court would hear arguments concerning its admission. When the prosecutor explained that he was not arguing that the first forensic interview would not be played for the jury, the trial court stated that the State could move the first interview in for identification purposes and then it would "identify a time either early in the morning or late in the evening" to determine whether the recording of the first forensic interview would be admitted as substantive evidence.

At trial, A.C. testified that she had talked to a woman at the CAC on two different occasions about what happened with the Defendant and that these two interviews had been recorded. She asserted that she watched these two recorded interviews at the prosecutor's office shortly before trial. A.C. specifically noted that these two recordings occurred in

different years because in one interview she did not have glasses and in the other interview she did have glasses. During A.C.'s direct examination, the following exchange occurred:

> Q. Okay. Now when you talked to her on that second interview, and if you had said that [the Defendant's] private went into your private in that interview, were you trying to tell her the truth or was that made up?
>
> A. I don't know. Because in the video I also did tell some things that weren't true.
>
> Q. Like what?
>
> A. I don't know. Like a lot of things. Mostly a lot.

On cross-examination, A.C. acknowledged that she watched the recordings of her forensic interviews four times and that she watched these recordings the day prior to her trial testimony. When questioned about the two forensic interviews, A.C. testified:

> Q. And would you agree with me that you . . . don't tell the same story on the second interview, is that right?
>
> A. Yes. In one of them, I told a lot of lies that were not true.
>
> Q. Tell me about that. Tell me about what were the lot of lies that were not true?
>
> A. I don't remember all of them. But I do know that most of them were not true.
>
> Q. Okay. Is it when you were talking about being inappropriate?
>
> A. Yes.
>
> Q. So, it was the second interview. Because the first interview you didn't say anything was happening, correct?
>
> A. Yes.

- 32 -

Q.     And, so, on the second one where you are talking about what happened, did you tell any lies in that one?

A.     Yeah, a few.

Q.     Okay.  But do you remember what they were?

A.     No.

Q.     Did they have to do with the inappropriate stuff?

A.     Some of them, yes.

Q.     But, again, you can't remember which ones?

A.     Yes, I can't remember.


On redirect examination, A.C. identified the video recordings from her first and second forensic interviews.  She stated that she looked at the recordings of her forensic interviews the prior day and put her initials on them.  When the prosecutor asked her what was on these recordings, A.C. replied, "It's the interview that I did with this woman.  They also gave me these drawings."   The State then asked that the first and second forensic interviews be entered for identification purposes, and the trial court noted that "[w]ithout objection" from the defense, the recordings of the forensic interviews would be entered as Identification Exhibit No. 2.

Later, during Elizabeth Benton's direct examination at trial, the State played the recordings of A.C.'s first and second forensic interviews for the jury.  The State then asked for the first and second forensic interviews to be admitted into evidence, and the trial court stated, "Without objection, it will be Collective Exhibit 2."

In his amended motion for new trial, the Defendant alleged that the trial court "erred in permitting forensic videos to be played in full for the jury."  At the hearing on this motion, defense counsel repeated this argument and acknowledged that  although he did not object to these forensic videos, it "still ma[de] sense" for the Defendant to raise it in his motion for new trial.  The trial court, recognizing that the Defendant had failed to make a contemporaneous objection to the introduction of both forensic interviews, held that it would "stand by" its decision for the forensic interviews to be played in full by the State at trial.

- 33 -

At the outset, the Defendant concedes that he is limited to plain error review. See Tenn. R. App. P 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence). For this court to find plain error,

> "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'"

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)).

Plain error "must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (citations and internal quotations marks omitted). It is the defendant's burden to persuade an appellate court that the trial court committed plain error. State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010). "[T]he presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." Smith, 24 S.W.3d at 283. A recognition of plain error "should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642. Plain error relief should be "sparingly exercised[,]" see State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007), and is only appropriate for errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006). "'[R]arely will plain error review extend to an evidentiary issue[.]'" State v. Haymer, 671 S.W.3d 568, 579 (Tenn. Crim. App. 2023) (quoting State v. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007)).

Tennessee Code Annotated section 24-7-123 allows for the admissibility as substantive evidence of a video recording of a forensic interview of a child under the age of thirteen where the child describes any act of sexual contact performed with or on the child by another, if certain requirements are met. Tenn. Code Ann. § 24-7-123(a) (Supp. 2022). The interview "may be considered for its bearing on any matter to which it is

- 34 -

relevant in evidence at the trial" of the defendant.  Id.  Pursuant to this statute, the video recording "may" be admitted if:

(1) The child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination;

(2) The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pretrial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors:

(A) The mental and physical age and maturity of the child;
(B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;
(C) The timing of the child's statement;
(D) The nature and duration of the alleged abuse;
(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;
(F) Whether the statement is spontaneous or directly responsive to questions;
(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;
(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;
(I) The relationship of the child to the offender;
(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and
(K) Any other factor deemed appropriate by the court;

(3) The interview was conducted by a forensic interviewer who met the following qualifications at the time the video recording was made, as determined by the court:

(A) Was employed by a child advocacy center that meets the requirements of § 9-4-213(a) or (b); provided, however, that an interview shall not be inadmissible solely because the interviewer is employed by a child advocacy center that:

- 35 -

(i) Is not a nonprofit corporation, if the child advocacy center is accredited by a nationally recognized accrediting agency; or

(ii) Employs an executive director who does not meet the criteria of § 9-4-213(a)(2), if the executive director is supervised by a publicly elected official;

(B) Had graduated from an accredited college or university with a bachelor's degree in a field related to social service, education, criminal justice, nursing, psychology or other similar profession;

(C) Had experience equivalent to three (3) years of fulltime professional work in one (1) or a combination of the following areas:

(i) Child protective services;
(ii) Criminal justice;
(iii) Clinical evaluation;
(iv) Counseling; or
(v) Forensic interviewing or other comparable work with children;

(D) Had completed a minimum of forty (40) hours of forensic training in interviewing traumatized children and fifteen (15) hours of continuing education annually;

(E) Had completed a minimum of eight (8) hours of interviewing under the supervision of a qualified forensic interviewer of children;

(F) Had knowledge of child development through coursework, professional training or experience;

(G) Had no criminal history as determined through a criminal records background check; and

(H) Had actively participated in peer review;

(4) The recording is both visual and oral and is recorded on film or videotape or by other similar audiovisual means;

(5) The entire interview of the child was recorded on the video recording and the video recording is unaltered and accurately reflects the interview of the child; and

(6) Every voice heard on the video recording is properly identified as determined by the court.

Id. § 24-7-123(b). "The court shall make specific findings of fact, on the record, as to the basis for its ruling under this section." Id. § 24-7-123(d). The Tennessee Supreme Court held that Code section 24-7-123 "serves as a specific and limited exception to the general rule against the admission of hearsay evidence[.]" State v. McCoy, 459 S.W.3d 1, 10 (Tenn. 2014).

First, the Defendant argues that the second forensic interview lacks trustworthiness because A.C. never testified, under oath, that the offered interview recording was a true and correct recording of the events contained therein as required by Code section 24-7-123(b)(1). He claims that A.C.'s testimony at trial suggests that if the prosecutor had asked her if the recording was a true and correct recording of events from her second forensic interview, A.C. would have been unable to recall.

Subsection (b)(1) requires that "[t]he child testif[y], under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross[-]examination[.]" Tenn. Code Ann. § 24-7-123(b)(1). The Tennessee Supreme Court has held that this subsection "requires the witness to authenticate the video recording before it is submitted, and to be available for cross-examination at trial." McCoy, 459 S.W.3d at 15; see State v. Stegall, No. W2022-00628-CCA-R3-CD, 2023 WL 6319610, at *7 (Tenn. Crim. App. July 14, 2023), reh'g denied (Sept. 27, 2023) (acknowledging that the victim may testify under oath at either the pretrial hearing or the trial as to the accuracy and authenticity of the recording of the forensic interview before the recording is played for the jury). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a), (b)(1). Both Rule 901 and the common law assign the trial court as the "arbiter of authentication issues[.]" Tenn. R. Evid. 901, Advisory Comm'n Cmts. Questions concerning the admissibility of a forensic interview rest within the sound discretion of the trial court, and this court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record. State v. Franklin, 585 S.W.3d 431, 448 (Tenn. Crim. App. 2019).

Here, at the pretrial hearing, the trial court concluded that it was "reasonably satisfied that the video recording[s] possessed particularized guarantee[s] of . . . trustworthiness" pursuant to Code section 24-4-123(b) based on the cross-examination

questions the defense asked. At no time during the proceedings did the defense claim that the recording of the second forensic interview was anything other than a true and correct recording of the events contained therein. At trial, A.C., who was ten years old, testified she had talked to a woman at the CAC on two different occasions about what happened with the Defendant and that these two interviews had been recorded. She asserted that she watched these two recorded interviews at the prosecutor's office shortly before trial. On cross-examination, A.C. acknowledged that she watched the recordings of her forensic interviews four times and that she watched these recordings the day prior to her trial testimony. On redirect examination, A.C. identified the disk containing video recordings from her first and second forensic interviews. She stated that she looked at the recordings of her forensic interviews the prior day and put her initials on this disk. When the prosecutor asked her what was on these recordings, A.C. replied, "It's the interview that I did with this woman. They also gave me these drawings." Given A.C.'s young age, we conclude that A.C.'s testimony fulfilled the requirement that "the offered video recording is a true and correct recording of the events contained" therein. See Tenn. Code Ann. § 24-7-123(b)(1).

While A.C.'s testimony about the veracity and accuracy of the recording occurred at trial, we believe she sufficiently authenticated the recording of the second forensic interview before it was published to the jury during Elizabeth Benton's testimony at trial. See McCoy, 459 S.W.3d at 15; Stegall, 2023 WL 6319610, at *7. There is nothing in the record to indicate that this recording was anything other than what A.C. claimed it to be. See State v. Worley, No. M2023-00867-CCA-R3-CD, 2025 WL 101656, at *13 (Tenn. Crim. App. Jan. 15, 2025) (concluding there was no plain error when the record did not indicate that the recording of the forensic interview was anything other than what the proponent claimed it to be), perm. app. denied (Tenn. June 18, 2025). Because the video recording of A.C.'s second forensic interview was properly authenticated, the Defendant cannot show a breach of a clear and unequivocal rule of law, that a substantial right of the accused was adversely affected, or that the consideration of the error is necessary to do substantial justice.

Moreover, the Defendant has failed to establish that he did not waive this issue for tactical reasons. See Smith, 24 S.W.3d at 282; State v. Vance, 596 S.W.3d 229, 254 (Tenn. 2020) (reiterating that it is the defendant's burden to persuade an appellate court that all five factors for plain error review have been met). Defense counsel attempted to use A.C.'s inconsistent statements, including the ones she made during her first and second forensic interviews, to discredit A.C. at trial. He cross-examined A.C. at length regarding her differing statements about the abuse that she provided in her trial testimony, her first forensic interview, and her second forensic interview. The defense strategy clearly focused on impeaching A.C. with all her inconsistent statements, including those from the first and second forensic interviews, to support its theory that Ms. Cunningham, with the assistance

- 38 -

of Reguli, coerced A.C. into making false sexual abuse allegations against the Defendant to gain an advantage in the Cunninghams' divorce case. The record shows that the defense attempted to use the second forensic interview in its defense strategy rather than directly challenge its admission, which would have most likely been denied by the trial court. Accordingly, the Defendant has failed to show he did not waive the playing of the second forensic interview for tactical reasons.

Second, the Defendant asserts that the trial court erred in failing to consider all the factors in Code section 24-7-123(b)(2) before concluding that the recording of the second forensic interview possessed particularized guarantees of trustworthiness. He claims that the trial court made findings on "only a few factors outlined in the statute" and failed to consider other factors, "such as the mental and physical age of A.C., her maturity, or the spontaneity of [A.C.'s] statements." He also asserts that the trial court did not review the video of the second forensic interview during the pretrial hearing, that A.C. did not testify at the pretrial hearing, and that A.C. did not recall the events discussed in the forensic interview during her trial testimony. He asserts that A.C.'s statements in the first forensic interview contradicted her statements in the second forensic interview and her statements at trial under oath. Lastly, he states that A.C. admitted that she lied during the second forensic interview, wherein she incriminated the Defendant, and that she made numerous false statements to the interviewer.

A trial court ruling on the admissibility of a video recording of a forensic interview of a child "shall make specific findings of fact, on the record, as to the basis for its ruling[.]" Tenn. Code Ann. § 24-7-123(d). Here, the Defendant essentially complains that the trial court's failure to make findings of fact on all the factors warrants a reversal of his convictions. Despite the Defendant's claims to the contrary, we disagree that the trial court did not review the recording of the second forensic interview during the pre-trial hearing. We also question whether the trial court's specific findings of fact, which it made on the record before concluding that the recording had particularized guarantees of trustworthiness, were insufficient. In any case, we have meticulously reviewed the recording of the second forensic interview and agree with the trial court that it possesses particularized guarantees of trustworthiness based on all the factors in Code section 24-7-123(b)(2). Accordingly, the Defendant is not entitled to plain error relief because he has failed to show that a clear and unequivocal rule of law was breached, that a substantial right of the accused was adversely affected, or that consideration of the error is necessary to do substantial justice.

Third, the Defendant contends he was denied his right to confront and cross-examine A.C. because A.C. was unable to discuss details of her alleged abuse at trial, because she was unable to identify the portions of the second forensic interview that were lies, and because she denied almost all the allegations of sexual abuse she had previously

disclosed in this forensic interview. He claims A.C.'s lack of memory and her reluctance to testify made cross-examination impossible. The Defendant reiterates that A.C. admitted she lied during the second forensic interview, including about her allegations that the Defendant sexually abused her, and that A.C.'s statements at trial were inconsistent with the ones she made in the second forensic interview.

We conclude that the Defendant has also waived any standalone issue regarding his right to confront A.C. by failing to include this issue in his motion or amended motion for new trial. See Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."). The Defendant also waived this issue by not raising a confrontation objection at that time regarding the "quality" of A.C.'s testimony. See Franklin, 585 S.W.3d at 455 (concluding that the confrontation claim was waived where the victim was unwilling to discuss the details of the incident at trial but the defendant did not raise a confrontation objection or request that the victim's testimony be stricken from the record); see also Tenn. R. App. P. 36(a) (stating that relief is not required for a party "who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Therefore, we will evaluate this issue for plain error.

The right of confrontation provides "two types of protection for criminal defendants: the right to physically face the witnesses who testify against the defendant, and the right to cross-examine witnesses." State v. Williams, 913 S.W.2d 462, 465 (Tenn. 1996). The admission of forensic interviews "does not violate a defendant's right of confrontation so long as the child witness authenticates the video recording and appears for cross-examination at trial, as required by our statute." McCoy, 459 S.W.3d at 16. "Although the Confrontation Clause does not guarantee 'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish,' it does require that a defendant be given 'an opportunity for effective cross-examination' of the witness." Id. at 15 (quoting United States v. Owens, 484 U.S. 554, 559 (1988)).

Here, the record shows that A.C. authenticated the video recording and appeared for cross-examination. It also shows that the Defendant had the opportunity to conduct a full cross-examination of A.C. at trial. See State v. Ruzicka, No. W2023-00134-CCA-R3-CD, 2024 WL 3387294, at *12-13 (Tenn. Crim. App. July 12, 2024). Here, A.C. testified, and the defense conducted an extensive cross-examination of her. We conclude that A.C.'s hesitancy to testify regarding the details of the sexual abuse does not detract from the fact that the Defendant was given the opportunity to cross-examine her at trial in accordance

with the Confrontation Clause.  Accordingly, the Defendant has failed to show that a clear and unequivocal rule of law was breached, that a substantial right of the accused was adversely affected, or that consideration of the error is necessary to do substantial justice. Because the Defendant has failed to establish all five factors with regard to these issues, he is not entitled to plain error relief.

II. **Sufficiency of Evidence.** The Defendant maintains that the evidence presented at trial is insufficient to sustain all his convictions for rape of a child and aggravated sexual battery.  He asserts that A.C. denied several times at trial that the Defendant ever touched her "privates" or had her touch his "privates."  He notes that although A.C. continued to assert that the Defendant was "inappropriate" during her trial testimony, she failed to provide specific details supporting the elements of the conviction offenses.  Moreover, he claims A.C. admitted she was dishonest during her forensic interview and that some of her lies concerned the "inappropriate stuff" with the Defendant, although she could not recall the specific lies she told.  Furthermore, he highlights that A.C.'s medical exam did not reveal evidence of sexual assault or penetration.  The Defendant insists that the video of the forensic interview was improperly admitted and that without this interview, the State is left with "virtually nothing proving the elements of Rape of a Child or Sexual Battery." In response, the State contends that, despite A.C.'s contradictory evidence, any rational trier of fact would have found the Defendant was guilty of rape of a child and aggravated sexual battery after A.C. provided testimony regarding instances of the Defendant's specific conduct.  We conclude that there is sufficient evidence to sustain the Defendant's convictions.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict."  State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e).  When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence.  State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two.  State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).  The standard of review for

sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting Hanson, 279 S.W.3d at 275). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As charged in this case, rape of a child is the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522 (Supp. 2013). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id. § 39-13-501(7).

As charged in this case, aggravated sexual battery is "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [where] [t]he victim is less than thirteen (13) years of age." Id. § 39-13-504(a)(4). "Sexual contact" is statutorily defined to include:

> the intentional touching of the victim's, the defendant's, or any other person's intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's, the defendant's, or any other person's intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]

Id. § 39-13-501(6). "'Intimate parts" includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Id. § 39-13-501(2). "'Intentional' means that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result[.]" Id. § 39-11-106(a)(18) (Supp. 2011).

The Defendant argues that A.C.'s testimony at trial was inconsistent, specifically referencing the following portions of A.C.'s testimony on direct examination:

Q. All right. So, when your dad did inappropriate things, what parts of his body touched you?

A. Sometimes hand.

Q. Okay.

A. And sometimes privates.

Q. Okay. And tell the jury where all he would touch you with his hand.

A. Mostly like the ribs like the ribs from my rib cage sometimes.

Q. Okay. Were there any times that he would touch you on your privates with his hand?

A. Not that I can remember, no.

Q. Okay. Were there times when he would touch you on the butt with his hand?

A. No.

Q. Okay. Where would he touch you with his privates? Okay. So when he would—did he ever touch your private with his private?

A. No.

Q. Okay. Did he ever have you touch him in any way?

A. No.

Q. What about mouths? Was [sic] anybody's mouths involved in anything.

A. No, not that I know.

. . .

- 43 -

Q.      Okay.  Were there any times when his private touched your private?

A.      No.

. . . .

Q.      Okay.  Do you remember a time that he touched you on your face with his private?

A.      No.

Q.      Okay.  You don't remember that?

A.      No.

The Defendant emphasizes that A.C. said she was "not so scared and nervous" during her trial testimony.

The Defendant also references later testimony by A.C.  The prosecutor had A.C. clarify on a male anatomical drawing what a male's private part was and then asked, "So, has that part of your dad's body ever touched your body anywhere that you can remember?" A.C. replied, "Not that I can remember."  A.C. stated that she remembered one time when the Defendant "licked [her] privates"; she first claimed this happened "only once" but later stated that it happened "three or four times."  The Defendant claims that this testimony conflicted with her earlier testimony that the Defendant never touched her privates and her prior testimony that mouths were never involved in the conduct.

The Defendant argues that testimony from a single witness will be disregarded when the testimony "is not of a cogent and conclusive nature, and 'if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon." Letner v. State, 512 S.W.2d 643, 649 (Tenn. Crim. App. 1974) (quoting 23 C.J.S. Criminal Law § 903).  He claims that because A.C. made "multiple contradictory sworn statements," her testimony is unsafe to rest a conviction thereon.  We disagree.

For Count 1, the State elected the following offense: "Count 1 RAPE OF A CHILD alleges an act of penile-genital penetration wherein A.C. describes the defendant putting his 'private' in her 'private' and specified both the female and male genitalia on anatomical drawings during the 2/10/20 forensic interview."  In the February 20, 2020 forensic

interview with A.C., which was played for the jury, A.C. pointed to the boy's penis on the anatomical drawing and stated that she called this area a "winky." A.C. then pointed to the girl's vaginal area on the anatomical drawing to identify one of the two areas that A.C. had previously stated that her dad used his "winky" to "push[] hard sometimes." When Benton asked what her dad does when he "pushes hard," A.C. pointed to the boy's penis on the anatomical drawing and then she said her dad puts his penis in her vaginal area, and she pointed to this area on the anatomical drawing of the girl." When Benton asked where exactly her dad put his "winky" when he puts it in her vaginal area, A.C. replied that her dad put it "where girls go potty . . . like go pee pee." Benton then asked if her dad pushed hard on her vaginal area or buttocks, and A.C. pointed to the penis and vaginal areas on the anatomical drawings and said that her father put his privates in her vagina "the most" and this happens when her legs are "crossed and not crossed[.]" A.C. pointed to the girl's vaginal area on the anatomical drawing and said that when her legs were not crossed her dad's winky would go in "the hole" where she "goes tinkle."

For Count 2, the State elected the following offense: "Count 2 RAPE OF A CHILD alleges an act of painful penile-genital penetration based upon A.C.'s description during the 2/10/20 forensic interview that 'sometimes' the defendant 'pushes hard' and that said penetration 'hurt.'" In the February 20, 2020 forensic interview, A.C. stated that her dad had been "putting his privates in mine." She added that her father put his privates in her legs and in her privates. A.C. said, "Sometimes he pushes hard, and I don't really like it." A.C. later said her dad "sometimes pushes hard" with his "privates" or "winky" and when he does it on her vagina it "hurts."

For Count 3, the State elected the following offense: "Count 3 RAPE OF A CHILD alleges an act of penile-anal penetration wherein A.C. describes the defendant putting his private in her 'butt' and specified both the female buttocks and male genitalia on anatomical drawings during the 2/10/20 forensic interview." In the February 20, 2020 forensic interview, A.C. pointed to the boy's penis on the anatomical drawing, which she called a "winky." A.C. then pointed to the girl's buttocks area on the anatomical drawing to identify one of the two areas that A.C. had previously stated that her dad uses his "winky" to "push[] hard sometimes." A.C. pointed to the boy's penis and stated that her dad put his penis in her buttocks, and she pointed to this area on the anatomical drawing of the girl. When Benton asked how it felt when her dad put his "winky" in her buttocks, A.C. said, "It hurts." Benton asked how many times he put his "winky" here, pointing to the buttocks on the girl's anatomical drawing, and A.C. said her father put his penis in her buttocks "like forty-six times."

For Count 4, the State elected the following offense: "Count 4 RAPE OF A CHILD alleges an act of painful penile-anal penetration based upon A.C.'s description during the 2/10/20 forensic interview that 'sometimes' the defendant 'pushes hard' and that said

penetration 'hurt.'" In the February 20, 2020 forensic interview, A.C. said her dad "sometimes pushes hard" with his "privates" or "winky" and when he does that on her butt "it hurts."

For Count 5, the State elected the following offense: "Count 5 RAPE OF A CHILD alleges an instance of cunnilingus based upon A.C.'s description during the 2/10/20 forensic interview of the defendant 'licking' her private part." In the February 10, 2020 forensic interview, A.C. said her mother "would always catch us" and her dad did not like it so he would "hide under the blanket." She said this occurred at their "old house" and in her mom and dad's room. She said her mom did not see anything, but she knew "inappropriate" things happened because they were under the blanket together. Specifically, she said her father would "lick her privates" by putting his "tongue on it." She said this happened more than one time and that her father "did a lot of things more than one time." At trial, A.C. testified that she remembered an incident where the Defendant "licked [her] privates" and although she initially stated that this happened only one time, she quickly corrected herself and stated that this had happened "three or four times."

For Count 6, the State elected the following offense: "Count 6 RAPE OF A CHILD alleges an instance of cunnilingus based upon A.C.'s statement made during her 10/5/20 visit to Our Kids Center wherein A.C. said that the defendant's tongue 'went inside' her 'lady part.'" Howlett testified that at the October 5, 2020 appointment with A.C. at Our Kids Center, A.C. told her that the Defendant "licked" her lady parts, and that this occurred more than one time. Nurse Practitioner Littrell testified that she examined A.C. on October 5, 2020, at Our Kids Center and knew that A.C. provided in her medical history to Howlett that the Defendant touched her "lady parts" and that the Defendant put his tongue inside her lady parts.

For Count 7, the State elected the following offense: "Count 7 RAPE OF A CHILD alleges an instance of fellatio based upon A.C.'s statement made during her 10/5/20 visit to Our Kids Center wherein A.C. said that the defendant 'made me put my mouth on his part.'" Howlett testified that at the October 5, 2020 appointment with A.C. at Our Kids, A.C. said that sometimes the Defendant made her put her mouth on his penis. Nurse Practitioner Littrell testified that A.C. provided in her medical history to Howlett that the Defendant made her touch his "part" with her hand or her mouth.

For Count 8, the State elected the following offense: "Count 8 AGGRAVATED SEXUAL BATTERY alleges an act of sexual contact based upon A.C.'s description during the 2/10/20 forensic interview of the defendant having A.C. cross her legs while the defendant slid his 'winky' between her legs 'almost where I go pee' (indicating an area between her upper thighs and just below her genitalia)." In the February 20, 2020 forensic

interview, A.C. said that her father put his privates in her vagina "the most" and this happens when her legs are "crossed and not crossed" and that her legs were "mostly" crossed when the "yucky white/yellow stuff comes out." She said that when her legs were crossed, her dad's winky would go "almost where [she] goes pee pee." At trial, A.C. testified that during one incident, the Defendant's privates touched her legs after the Defendant told her to have her legs "crossed."

For Count 9, the State elected the following offense: "Count 9 AGGRAVATED SEXUAL BATTERY alleges an act of sexual contact based upon A.C.'s statement made during her 10/5/20 visit to Our Kids Center wherein A.C. said that the defendant 'put my feet on his part.'" Howlett testified that A.C. stated during her October 5, 2020 visit that the Defendant sometimes put A.C.'s feet on his penis.

For Count 10, the State elected the following offense: "Count 10 AGGRAVATED SEXUAL BATTERY alleges an act of sexual contact based upon A.C.'s statements made during her 2/10/20 forensic interview wherein A.C. said that the defendant hit A.C.'s face with his 'winky' while trying to 'be funny.'" During the February 20, 2020 forensic interview, A.C. said that her dad "tried to be funny" and hit her in the face with his privates."

For Count 11, the State elected the following offense: "Count 11 AGGRAVATED SEXUAL BATTERY alleges an act of sexual contact based upon A.C.'s statement made during her 2/10/20 forensic interview wherein A.C. said that the whitish-yellow substance that came out of the defendant's 'winky' went onto A.C.'s chest." At trial, A.C. testified that "white, yellowish, chunky like, thick stuff" would come out of the Defendant's private part. During the February 10, 2020 forensic interview, A.C. was asked if she had ever seen anything come out of her dad's "winky," and A.C. said that it was "this really gross stuff" that she "didn't really like" that was "whitish yellow." A.C. said that the "yucky white/yellow" stuff only got on her chest one time, and the rest of the time it got on the bed. At trial, A.C. testified that she remembered "white, yellowish, chunky like, thick stuff" would come out of the Defendant's private, and that this stuff from the Defendant's private went "[m]ostly on [her] chest."

For Count 12, the State elected the following offense: "Count 12 AGGRAVATED SEXUAL BATTERY alleges an act of sexual contact based upon A.C.'s statement made during her 2/10/20 forensic interview wherein A.C. said that the defendant licked the whitish-yellow substance off A.C.'s chest." During the February 10, 2020 forensic interview, A.C. stated that one time her father "licked" the "whitish yellow" substance off her "chest" even though she didn't think it was "really good or something to drink." At trial, A.C. testified that the "white, yellowish, chunky like, thick stuff" from the

Defendant's private went "[m]ostly on [her] chest" and that the Defendant would clean it off by "lick[ing] it off or sometimes clean[ing] it with like a paper towel."

For Count 13, the State elected the following offense: "Count 13 AGGRAVATED SEXUAL BATTERY alleges an act of sexual contact based upon A.C.'s statement made during her 10/5/20 visit to Our Kids Center wherein A.C. said that the defendant 'made me touch with my hand on his part.'" Howlett testified that during A.C.'s October 5, 2020 visit to Our Kids Center, Howlett then asked A.C. if she had to touch the Defendant's body in any way, and A.C. replied, "[H]e made me. I didn't want to." Howlett said A.C. told her that the Defendant made her touch his penis with her hand, and that this occurred "a lot of times." Nurse Practitioner Littrell testified that she examined A.C. on October 5, 2020, at Our Kids Center and knew that A.C. provided in her medical history to Howlett that the Defendant made her touch his "part" with her hand or her mouth.

This court has recognized that "contradictory [sworn] statements by a witness in connection with the same fact cancel each other." State v. Matthews, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993) (citing Taylor v. Nashville Banner Pub. Co., 573 S.W.2d 476, 482 (Tenn. Crim. App. 1978)); see State v. Harris, No. M2000-02143-CCA-R3-CD, 2001 WL 1218582, at *2 (Tenn. Crim. App. Oct. 12, 2001) ("The rule of cancellation is typically limited to circumstances in which the witness has sworn to each statement."). The "rule of cancellation" addresses circumstances in which "the proof of [a] fact lies wholly with one witness, and he both affirms and denies it," resulting in no "evidence at all to prove the fact." Matthews, 888 S.W.2d at 449-50 (quoting Johnston v. Cincinnati N.O. & T.P. Ry. Co., 240 S.W. 429, 436 (Tenn. 1922)). The Matthews court explained that unlike a situation in which the jury hears contradictory testimony from two different witnesses and must make a credibility determination, "a witness's self-contradicting testimony means that each version carries equal weight and cannot be resolved by the jury except through whimsy." Id. (citing Johnston, 240 S.W. at 436). The rule of cancellation applies "only when inconsistency in a witness'[s] testimony is unexplained and when neither version of his testimony is corroborated by other evidence." Id. at 450 (citing Taylor, 573 S.W.2d at 483).

Generally, a defendant may be convicted upon the uncorroborated testimony of a single witness. Letner, 512 S.W.2d at 649; see State v. McKnight, 900 S.W.2d 36, 48 (Tenn. Crim. App. 1994) (reiterating that a "defendant can be convicted of simple rape based solely upon testimony of the victim"). However, exceptional circumstances may require this court to disregard a witness's testimony as a matter of law:

> [A]lthough as a general rule a conviction may rest upon the testimony of a single witness, though it be contradicted by others or appear uncertain or inconsistent, the rule does not apply if the testimony of such single witness

- 48 -

is not of a cogent and conclusive nature, and "if it is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon."

Letner, 512 S.W.2d at 649 (citing 23 C.J.S. Criminal Law § 903(19)); but see State v. Johnson, 1988 WL 69539, at *2 (Tenn. Crim. App. July 8, 1988) (noting that the above language was "clearly dictum" and observing that "[t]he Letner court was at pains to deal with an eyewitness whose testimony was not wholly consistent with the testimony of several others who were at the scene"), and State v. Walker, No. 01C01-9711-CR-00535, 1999 WL 219629, at *3 (Tenn. Crim. App. Apr. 16, 1999) (distinguishing the Walker case from Letner because the witness's statements immediately following the incident were explained by "her intoxicated and hysterical state" and were influenced by the defendant's "suggestion that the victim had shot himself," and her trial testimony was corroborated by several pieces of evidence).

Despite the Defendant's claims, A.C. did not give contradictory sworn statements because the victim's only sworn testimony was provided by her at trial. See State v. Franklin, 585 S.W.3d at 458. We conclude that the statement A.C. provided during the second forensic interview was not a sworn statement. See id. ("[W]e do not find that the four-year-old victim's statements during the forensic interview were sworn statements."). Accordingly, despite the Defendant's arguments to the contrary, A.C. provided no contradictory sworn statements, and the rule of cancellation does not apply. See State v. Hopkins, No. E2016-02192-CCA-R3-CD, 2017 WL 4221148, at *7 (Tenn. Crim. App. Sept. 22, 2017) (concluding that although the witness gave unsworn, contradictory statements to police prior to trial, she gave consistent testimony at trial implicating Hopkins, which meant that the rule of cancellation did not apply).

We reiterate that the jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. Campbell, 245 S.W.3d at 335 (citing Byrge, 575 S.W.2d at 295). Here, the Defendant's sufficiency claims focus on his complaints regarding A.C.'s credibility. Despite the Defendant's argument to the contrary, it was the jury's prerogative to accredit the proof from A.C.'s February 10, 2020 forensic interview, the testimony of Howlett and Nurse Practitioner Littrell from Our Kids Center, and A.C.'s substantial testimony at trial that supported the counts of the indictment.

We believe any inconsistencies in A.C.'s testimony are explained by A.C.'s very young age at the time of the abuse, the ongoing nature of the Defendant's abuse, and the delay between the abuse and A.C.'s testimony at trial. See State v. Radley, 29 S.W.3d 532,

537 (Tenn. Crim. App. 1999) (stating that "a jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt"). We have already determined that the video recording of A.C.'s second forensic interview was properly admitted into evidence. While there were some inconsistencies in A.C.'s accounts of the offenses, the jury resolved these inconsistencies in favor of the State, as was its prerogative. See State v. Elkins, 102 S.W.3d, 582-83 (Tenn. 2003) (concluding that the evidence was sufficient to support the conviction for rape of a child because the inconsistencies in the victim's testimony "were not such as to create a reasonable doubt as to the defendant's guilt on the child rape charge"); State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996) (holding that inconsistencies in the evidence are resolved by the trier of fact); Byrge, 575 S.W.2d at 295 (reiterating that "the weight and credibility of testimony of a witness, and the reconciliation of conflicts in testimony, are matters entrusted exclusively to the jury as the triers of fact"). We decline the Defendant's invitation to re-weigh the evidence or to substitute our inferences for those drawn by the jury. Wagner, 382 S.W.3d at 297 (citing Bland, 958 S.W.2d at 659). The statements A.C. made during the February 10, 2020 forensic interview, the statements A.C. gave to Howlett, and A.C.'s statements recorded in her medical history, as testified to by Nurse Practitioner Littrell, all occurred within a short time of the abuse and provided sufficiently consistent evidence of the Defendant's guilt. The jury heard all the proof presented at trial and was able to fully consider A.C.'s credibility before rendering its verdict. Viewing the evidence in the light most favorable to the State, we conclude the evidence was sufficient to sustain all thirteen of the convictions in this case.

**III. Prior Bad Acts.** The Defendant argues that the trial court erred in admitting prior bad act evidence via a text message thread between Bratcher and Ms. Cunningham, suggesting that he had cheated on his wife and had been previously violent toward her. He also asserts that admission of this evidence was not harmless because this evidence undermined the fairness of his trial and, more probably than not, affected the jury's assessment of his character, which was a key issue at trial. Referencing his previous issue, he claims that there was insufficient evidence to sustain his convictions because there was no corroborative evidence of A.C.'s allegations, A.C. initially denied any sexual abuse by the Defendant, A.C. admitted she lied during her forensic interviews, and A.C. waffled on the allegations. The Defendant claims that considering the insufficiency of the evidence, the admission of the prior bad act evidence, which amounted to a "character assassination," likely tipped the scales unfairly against him. In response, the State asserts that the Defendant waived this issue by not requesting a Rule 404(b) hearing and by objecting on the ground that the evidence was irrelevant, rather than this evidence constituted a prior bad act. We conclude that the Defendant has waived this issue and is not entitled to plain error review.

During a pretrial hearing, the State asked about any redactions in the forensic interviews. The State noted that there were statements made during A.C.'s forensic interviews that the Defendant was abusive toward the family, and that in accordance with Rule 404(b), that evidence regarding "violence, or hot tempers, or yelling and screaming in the house, just to the extent that [the Defendant] could have been scary to a child would be relevant for purposes of creating a full picture for the jury in this case." The trial court held that if the defense had a request for redaction for this type of information from the forensic interview recordings, any redactions would have to occur prior to trial because the court would not stop in the middle of trial to do such redactions.

At trial, the State had Bratcher identify a text message thread between herself and Ms. Cunningham, which took place between June 4, 2019, and June 7, 2019. When the State tried to enter this text message thread into evidence, the defense asked for a bench conference. During this conference, defense counsel said he had no objection to these text messages coming in except for the statement within the thread, wherein Bratcher told Ms. Cunningham that the Defendant had "screwed" with Ms. Cunningham's mind for years. Defense counsel argued that Bratcher did not "have the ability to testify to that" and that there was "no foundation on that." Defense counsel also objected to a second statement within the thread, wherein Bratcher told Ms. Cunningham that the Defendant was "a powerful manipulator" and "narcissist" who had "worked to control [her] mind for years" and that the Defendant was "a cheat" and "a liar." Defense counsel claimed this second statement "had not been testified about" and was not relevant. The trial court overruled the defense's objection to these statements within the text thread. The court then admitted the text thread as a collective exhibit to Bratcher's testimony.

On cross-examination, defense counsel read Bratcher's texts to Ms. Cunningham. Bratcher confirmed that she had texted Ms. Cunningham that "they" would not let Ms. Cunningham keep the children away from the Defendant and that the Defendant would "continue to hurt them" if the Defendant did not have charges filed against him. Bratcher explained that she wrote this because Ms. Cunningham had mentioned getting the Defendant into "therapy" and that she would like for her kids to see their father while he was "supervised." She stated that it was clear to her that Ms. Cunningham was "easily manipulated." Bratcher agreed that she was trying to convince Ms. Cunningham that if she did not get the authorities involved, then Ms. Cunningham's children would have to spend time alone with the Defendant. Bratcher stated that Ms. Cunningham told her that she did report the abuse, which was a lie. When Ms. Cunningham told her that she had "reported it" and that her mother was "mostly working on this" and that Bratcher could believe her or not, Bratcher said she was trying to give Ms. Cunningham every opportunity to tell her something that made sense. Bratcher asserted her belief that it would be better if Ms. Cunningham reported the abuse. She said Ms. Cunningham later told her that four days

after she reported the abuse, they "closed the case" against the Defendant.  At this point, defense counsel and Ms. Bratcher had the following exchange:

Q.      You go on to say some things, like this man is a manipulative narcissist.  He has worked to control your mind for many years.  He's a cheat and a liar.  He's totally disregarded your heart for many years, right?

A.      Yes.

Q.      Now, that information was provided to you through [Ms. Cunningham] over the years, is that right?

A.      I suppose you could say that.  I also saw things.  So, yeah.

Q.      Well, you saw things of him being a cheat and a liar?

A.      Yes.

Q.      How so?

A.      My husband saw him in the car with another girl when he was supposed to be on his way to work one day.  I saw bruises on [Ms. Cunningham] frequently when she would come to my house.  I saw many, many evidences [sic] of him being a cheat and a liar and just an all around not good man to her

Q.      But the first time—and she did disclose certain things like that to you over the years, yes?

A.      Yes.

Q.      That he was cheating on her or abusive or what have you, yes?

A.      Yes.


After the conclusion of Bratcher's testimony, the prosecutor argued, "[J]ust for the purposes of the record[,] . . . the text messages were provided in discovery in the State's

- 52 -

original discovery response [and t]he Defense has been in possession of these text messages since that time." The prosecutor then asserted,

> [T]he first time we ever heard about any type of proposed redactions was in the midst of [Bratcher's] testimony. After the Defense actually put in their opening statements information specifically contained in the text discussions between [Bratcher] and Victoria Cunningham about her lying about having reported [the abuse] to the police . . . .

> So, I'm just saying, any type of proposed redactions would have been, I think, more appropriately addressed at an earlier time.

After the trial court stated that the defense's objection was "preserved" and asked if the defense needed to put anything else on the record, defense counsel stated:

> I will just simply put on the record there is nobody—even though [these texts] were produced in discovery, there is no way for me to know what the State is going to introduce in evidence. And, therefore, as this was being initially proposed, I made the objection as to certain statements within those text messages that I felt were both irrelevant, both prior bad acts as well as her not having the foundational ability to testify to those things. So, as long as that's on the record, I'm good.

Although the Defendant contends that the trial court abused its discretion in admitting this text message thread under Rule 404(b), the record shows that defense counsel initially objected to this evidence on the grounds of lack of foundation and relevance. During his cross-examination of Bratcher, defense counsel read the texts at issue aloud to the jury and questioned Bratcher about those specific texts. Following Bratcher's testimony, defense counsel made a final argument in the jury-out hearing that the statements within the text thread were both "irrelevant" and "prior bad acts." We conclude that the Defendant waived this issue because he never requested a Rule 404(b) hearing on the text thread. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); see also Tenn. R. Evid. 404(b)(1) (stating that "[t]he court upon request must hold a [Rule 404(b)] hearing outside the jury's presence" (emphasis added)); State v. Jones, 151 S.W.3d 494, 498 n.3 (Tenn. 2004) (refusing to consider a Rule 404(b) claim where the defendant failed

to request a 404(b) hearing); State v. Gunn, No. W2016-00338-CCA-R3-CD, 2017 WL 4861664, at *12 (Tenn. Crim. App. Oct. 26, 2017) (concluding that the issue was waived because "the defendant did not request a 404(b) hearing" and "the trial court was not obligated to conduct one").

Finally, we note that the Defendant never requested plain error review in his initial brief, never filed a reply brief addressing the State's allegation of waiver of the Rule 404(b) issue, and never asked for plain error review of this issue. See Bledsoe, 226 S.W.3d at 355 ("It is the accused's burden to persuade an appellate court that the trial court committed plain error."); State v. Thompson, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief."). Therefore, we conclude that the Defendant is not entitled to plain error review of this issue.

**IV. Sentencing.** The Defendant contends that the trial court abused its discretion in imposing an excessive sentence of 100 years, which he claims was not justly deserved and was not in accordance with the purposes of the sentencing act. Specifically, he claims the trial court erred in applying two sentencing enhancement factors and in discounting substantial mitigation. He also claims the trial court erred in applying Code sections 40-35-115(b)(2) and 40-35-115(b)(5) to impose partially consecutive sentencing. The State responds that the trial court properly exercised its discretion in imposing the sentence in this case. We agree with the State.

Pursuant to State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012), this court reviews sentencing decisions under "an abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." The 2005 amendments to the Sentencing Act "served to increase the discretionary authority of trial courts in sentencing." Id. at 708.

Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

- 54 -

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; [and]

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (Supp. 2011). The defendant has the burden of showing the impropriety of the sentence on appeal. Id. § 40-35-401, Sentencing Comm'n Cmts. The trial court shall impose "a sentence justly deserved in relation to the seriousness of the offense[.]" Id. § 40-35-102(1). The court must also consider the defendant's potential for rehabilitation or treatment. Id. §§ 40-35-102(3)(C), -103(5). In addition, the court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

At the sentencing hearing, the presentence investigation report, the Defendant's statement of allocution, and letters in support of the Defendant were made exhibits. The defense presented several witnesses in support of the Defendant. Desmond Dickerson, a pastor and an adjunct professor, testified that he had known the Defendant's family for over twenty years and had known the Defendant since he was a teenager. Dickerson said he knew the Defendant to be of high character, reliable, and a man of his word. He asked the trial court to be "as lenient as possible" when sentencing the Defendant. John Peterson testified that he had known the Defendant since he was fourteen or fifteen years old. In the last year, Peterson hired the Defendant as a camera operator and editor, and he found the Defendant to be very knowledgeable, hardworking, and responsible. He asked the court to be merciful in sentencing the Defendant. Keith Hatchett testified that he had known the Defendant for two years and had worked with him over the last year to grow his insurance company. He stated that the Defendant had excellent character, a strong work ethic, regularly studied his Bible, and did not drink alcohol. Hatchett did not believe the Defendant was "guilty of anything" and asked the trial court to give the most lenient sentence possible. John Elliott Cunningham, the Defendant's father, testified that the Defendant had a strong work ethic doing various jobs in the music industry. He described the Defendant as a good father, a strong provider for his family, and a man of "impeccable character." He stated that the Defendant was a very compassionate and very empathetic person, and he asked the trial court for mercy in sentencing the Defendant. Mary Katherine Cunningham, the Defendant's mother, testified that the Defendant was "strong-willed," "creative," "compassionate," and "empathetic." She claimed the whole situation was "unnecessary" and "devastating" given the Defendant's innocence, and she asked the trial court to "have mercy" and "show compassion" because the Defendant had "so much to offer to the world."

At this hearing, the trial court asserted that it had considered the evidence presented at trial and at the sentencing hearing, the letters in support of the Defendant, the Defendant's statement of allocution, the presentence investigation report, the principles of sentencing, the arguments concerning alternatives in the sentencing length, the nature and characteristics of the criminal conduct in the case, the evidence and information regarding enhancement and mitigating factors, the statistical information regarding sentencing practices provided by the Administrative Office of the Courts, and the potential for rehabilitation or treatment. See id. § 40-35-210(b).

For Counts 1 through 7, the trial court determined that the Defendant was a Range II, multiple offender, which meant that his sentence range was twenty-five to forty years for each of these counts. See id. §§ 40-35-106(a), -112(b)(1). For Counts 8 through 13, the Defendant was a Range I, standard offender, which carried a range of eight to twelve years for each of these counts. See id. §§ 40-35-105, -112(a)(2).

At the conclusion of the sentencing hearing, the trial court sentenced the Defendant to thirty years for each conviction in Counts 1 through 7. See id. §40-35-112(b)(1). It also imposed a sentence of ten years for each conviction in Counts 8 through 13. See id. §40-35-112(a)(2). The trial court then ordered Counts 1 and 2 served concurrently, Counts 3 and 4 served concurrently, and Counts 5 and 6 served concurrently before ordering Counts 1 and 2, Counts 3 and 4, and Counts 5 and 6 served consecutively to one another. The court also ordered Counts 8 through 13 served concurrently with one another but consecutively to the sentences in the rape of a child counts and ordered Count 7 served concurrently with Counts 1 through 6 and Counts 8 through 13, for an effective sentence of 100 years.

At the motion for new trial hearing, the trial court held that it "put on the record. . . the grounds that it considered" in applying enhancement factors (7) and (14) as well as factors for consecutive sentencing. In addition, the court asserted that it would "stand by the weight" that it "put on the record for mitigating factors during sentencing."

First, the Defendant argues that the trial court erred in applying enhancement factor (7) and (14) because the evidence did not support application of such factors. He also contends that the trial court erred in failing to consider mitigating factors concerning the Defendant's lack of a criminal record and the testimony of several defense witnesses about the Defendant's character.

The trial court applied enhancement factor (7), that the offense involved a victim and was committed to gratify the Defendant's desire for pleasure and excitement, to the rape of a child offenses in Counts 1 through 7. See id. § 40-35-114(7). In addition, the

- 56 -

trial court applied enhancement factor (14), that the Defendant abused a position of private trust in a manner that significantly facilitated the commission or the fulfillment of the offense, to Counts 1 through 13, stating there "may not be another relationship that evokes a position of private trust more" than the "parent/child relationship." See id. § 40-35-114(14).

Regarding the mitigating factor (13), known as the "catch-all factor," the trial court stated that "based on the testimony today," it was considering evidence regarding the Defendant's work ethic and his caring, honest demeanor. See id. § 40-35-113(13). However, the court said, "I'm not going to rely on lack of criminal history. I think as citizens we are expected to comply with the law." The trial court stated that it would give mitigating factor (13) the weight it deserved "within the range of sentencing" the court was required to impose.

We conclude that the record fully supports the trial court's application of enhancement factors (7) and (14). Although the Defendant claims that the trial court erred in failing to consider the mitigating factors regarding his lack of a criminal record as a mitigating factor, we disagree. The transcript from the sentencing hearing shows the trial court specifically considered this catch-all mitigating factor, gave credit for the Defendant's work ethic and honest demeanor and made specific findings about why it was not considering the Defendant's lack of a criminal history as a mitigating factor. Ultimately, the trial court stated that it would give mitigating factor (13) the consideration and weight it deserved. The record shows that the trial court did not impose the maximum sentence for the rape of a child counts or the aggravated sexual battery counts. Accordingly, we conclude that the trial court properly exercised its discretion when imposing the length of the sentences in this case.

Second, the Defendant argues the trial court erred in applying code section 40-35-115(b)(2) and 40-35-115(b)(5) to impose a partially consecutive sentence. The Defendant claims that he did not have an extensive record of criminal activity pursuant to Code section 40-35-115(b)(2) because he had no prior criminal record, because there was no supporting testimony that the misconduct in this case occurred over a long span of time, because there was no testimony to determine the frequency within the time span or the geographical range of the misconduct, and because there were no other alleged victims. See State v. Perry, 656 S.W.3d 116, 129 (Tenn. 2022) (outlining six non-exclusive factors that courts should consideration in evaluating whether the proof establishes that the defendant is an offender whose record of criminal activity is extensive). He also argues that the trial court should not have applied Code section 40-35-115(b)(5) because A.C. recanted many of her claims regarding the Defendant's sexual abuse during her testimony, because A.C. was unable to recall details about the alleged abuse or the time span in which it happened, and because there was no testimony concerning residual mental damage to A.C. that resulted from the

alleged abuse. He cites to Dr. Berryman's testimony at trial that A.C. was more focused on her parents' fighting than the alleged sexual abuse.

The Tennessee Supreme Court held that the same "abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013); see Bise, 380 S.W.3d at 708; State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012). "[T]he presumption of reasonableness . . . giv[es] deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" Pollard, 432 S.W.3d at 861. "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. at 862 (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfield, 70 S.W.3d 698, 708 (Tenn. 2002).

Here, the trial court ordered partially consecutive sentencing pursuant to Code sections 40-35-115(b)(2) and (b)(5). First, the trial court applied Code section 40-35-115(b)(2), that "[t]he defendant is an offender whose record of criminal activity is extensive," because the Defendant was convicted of thirteen counts in this case, because the criminal activity occurred over a lengthy period of time, and because the criminal activity within that time span was frequent. See id. §40-35-115(b)(2). The trial court also applied Code section 40-35-115(b)(5), that the Defendant was "convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship" between the Defendant and the victim, who were father and daughter. See id. §40-35-115(b)(5). The trial court stated that although "the time span of the undetectable activity" was "not clear," the "nature and scope of the sexual acts" was "horrifying," and the "residual" issues that the victim faced must be insurmountable. See id. The court gave "the victim credibility in this case." The trial court held that based on the "facts at trial, sentencing hearing, [and] presentence investigation report, Code sections 40-35-115(b)(2) and (b)(5) were established by a "preponderance of the evidence." Thereafter, the trial court determined that Counts 1 and 2 would be served consecutively to Counts 3 and 4, which would be served consecutively to Counts 5 and 6. The court also determined that Counts 8 through 13 would be served concurrently to one another but consecutively to Counts 1 and 2, 3 and 4, and 5 and 6, for an effective sentence of 100 years.

- 58 -

The record fully supports the trial court's decision to order a partially consecutive 100-year sentence in this case. The trial court applied Code section 40-35-115(b)(2) because the Defendant was convicted of seven counts of rape of a child and six counts of aggravated sexual battery against his minor daughter. The court also found that the criminal offenses that the Defendant committed against his daughter occurred over a lengthy period and occurred frequently within that span of time. Based on the egregious facts in this case, we conclude that the trial court did not abuse its discretion in applying Code section 40-35-115(b)(2). The trial court also applied Code section 40-35-115(b)(5). It noted that the Defendant had been convicted of thirteen offenses involving the sexual abuse of his minor daughter, and although the trial court was unsure about the exact time span of the undetected sexual activity, it found that the "nature and scope of the sexual acts" was "horrifying" and that the "residual" damage to the victim faced overwhelming. Because the aggravating circumstances in this case were substantial, we conclude that the trial court did not abuse its discretion in applying Code section 40-35-115(b)(5). We recognize that the trial court did not impose the maximum sentence for each conviction in this case. In addition, we note that the trial court did not order all the Defendant's sentences served consecutively, which would have resulted in an effective sentence of 270 years. Given these considerations, we conclude that the trial court did not abuse its discretion in imposing a partial consecutive sentence of 100 years in this case.

As a final note, we detect several errors in the judgment forms in this case. Although the sentencing hearing transcript shows that the trial court carefully outlined the specifics of the Defendant's 100-year sentence, the judgment forms in this case do not reflect the trial court's sentence. The sentencing hearing transcript clearly shows that the trial court imposed concurrent sentencing in Counts 1 and 2, Counts 3 and 4, and Counts 5 and 6 and that the court determined that Counts 1 and 2 would be served consecutively to Counts 3 and 4, which would be served consecutively to Counts 5 and 6. This transcript also shows that the trial court determined that Counts 8 through 13 would be served concurrently with one another but consecutively to Counts 1 and 2, 3 and 4, and 5 and 6 and that Count 7 would be served concurrently with Counts 1 through 6 and Counts 8 through 13, for an effective sentence of 100 years. Accordingly, we remand this case to the trial court for entry of corrected judgment forms reflecting the above sentence, with the court to accurately complete the "Concurrent with:" and "Consecutive to:" sections as well as the "Special Conditions" section for each count to ensure that the Defendant's sentence is accurately reflected in the judgments forms in Counts 1 through 13.

**V. Depositions.** The Defendant contends the trial court erred when it ordered him to stop taking depositions in his divorce case and to turn over existing deposition transcripts to the State. He claims the trial court provided no authority to support its ruling, which gave the State an unfair advantage in previewing its potential witnesses' testimony and in

deciding whether to call certain witnesses at trial. He also asserts that the trial court in his criminal case overstepped its authority in halting any further discovery, which prejudiced him in both his criminal and divorce cases. The State counters that the trial court properly exercised its discretion in ordering the Defendant to stop taking depositions in the divorce case and to turn over existing deposition transcripts. We agree with the State.

The record shows that the Defendant and his wife, Victoria Cunningham, were in the middle of a bitter divorce when the criminal charges in this case were filed against the Defendant. Following the Defendant's indictment for the charges in this case, the parties agreed to a stay of the divorce case. Thereafter, the Defendant requested the divorce court to lift the stay to allow the divorce proceedings to continue, and Ms. Cunningham asked the court to leave the stay in place. Following a hearing, the divorce court authorized the commencement of discovery in the divorce case, as requested by the Defendant. The Defendant immediately deposed Ms. Cunningham. During this deposition, Ms. Cunningham referenced certain individuals who directly impacted the custody determination, and the Defendant issued several subpoenas to those individuals.

Thereafter, the State filed a motion to compel compliance with Tennessee Rule of Criminal Procedure 15, governing pre-trial depositions in criminal cases, after it discovered that the Defendant had deposed Ms. Cunningham in the divorce case and that the Defendant had issued subpoenas to depose several of the State's other potential witnesses prior to the scheduled criminal trial. In this motion, the State noted that Ms. Cunningham's deposition spanned two "full days" of testimony and that the Defendant had not scheduled any depositions of these witnesses after December 5, 2022. The State also shared that there were no hearings or any future court dates scheduled in the Cunninghams' divorce case. In its motion, the State asked the trial court to grant it access to copies of deposition transcripts and to order the Defendant to comply with Rule 15. The State argued that there was "no doubt that the defense would seek, at every opportunity, to impeach any criminal trial witness with their previous sworn testimony given during these depositions." It asserted that it should be able to review these depositions, so the Defendant did not "cherry-pic[k]" the prior statements of a State witness and then expose the jury to these prior statements "without ensuring that those statements are understood within the context of the witness's whole testimony." It also requested that the trial court order the Defendant take any depositions in his divorce case after the conclusion of his criminal trial, which was set to begin one month later. The State asked the trial court not to allow the Defendant to conduct his "own private shadow trial" prior to the selection of the jury in his criminal trial.

Defense counsel filed a response, contending that Rule 15 did not apply because the "depositions were taken in a civil matter outside the requirements of the Rules of Criminal Procedure" and were "specifically authorized" by the divorce court. He argued that allowing the defense to conduct depositions of the State's own witnesses did not provide

- 60 -

an unfair advantage to it, particularly when "the State's own preparation of witnesses and the substance of their testimony [was] not subject to disclosure to the Defendant prior to trial." The Defendant claimed that although the State had the ability "to contact and coordinate testimony for the criminal trial," the Defendant often did not have the same cooperation from the witnesses the State intended to call at trial. He asserted that "the State has had contact with witnesses [who] are directly advising the State as to what is being sought from them in the divorce [c]ourt," which "provides the State with advantages unavailable to the Defendant." For these reasons, defense counsel asked that the State's motion be denied.

On November 10, 2022, the trial court issued an order holding that Rule 15 did not apply because the depositions at issue were not taken pursuant to "any of the permissible purposes of the rule." Instead, the trial court held that this was an issue of "pretrial scheduling" and entered the following scheduling order "in the interests of justice and judicial economy":

1. Any deposition transcription that is subject to the State's motion cannot be used as substantive evidence in the trial of this case.

2. Both parties shall turn over full copies to opposing counsel of any deposition transcripts that are intended to be used, or may be used, at trial for impeachment purposes, 15 days before trial, meaning at latest by 5 PM on November 21, 2022.

3. By 5 PM on November 21, 2022, the Defense shall turn over to the State a copy of any deposition transcript of any of the State's witnesses, even if it is not anticipated to be used for impeachment purposes. The State shall return the transcript, and any copies made, to the Defendant within 5 days of the end of trial, or if needed, after a motion for new trial is heard.

4. The Court recognizes the common interplay between civil divorce cases and criminal cases involving some or all of the same parties and/or witnesses. However, the Court has a duty to ensure a fair trial for both the State and the Defendant. Therefore, the Court further orders that there shall be no further depositions of any of the State's potential witnesses in this case without leave of this court. To facilitate compliance with this order, the State shall turn over to the Defense its list of witnesses reasonably expected to be called during trial of this case by 5 PM on November 14, 2022.

At the motion for new trial hearing, the trial court stated that it was going to stand by its November 10, 2022 order. It noted that if the divorce case needed to move forward, then the Defendant could take depositions in that case after the criminal trial. It also recognized that if the Defendant was merely trying to elicit testimony from the State's witnesses prior to the criminal trial, then the court's ruling was proper.

"[T]he Tennessee Rules of Criminal Procedure lack a mechanism to force prospective witnesses to discuss their testimony with counsel before trial." State v. Singleton, 853 S.W.2d 490, 492 (Tenn. 1993). Unless there is a written agreement of the parties, Tennessee Rule of Criminal Procedure 15 narrowly restricts the availability of depositions in criminal cases, allowing their use only in "exceptional circumstances" when the "interest of justice" requires that a deposition be taken "to preserve [the] testimony" of a prospective witness who is unlikely to be able to testify at trial. Tenn. R. Crim. P. 15(a)(1); see Singleton, 853 S.W.2d at 493. The Committee Comment to Rule 15 makes it clear that "depositions are not meant to function as discovery devices in criminal cases" and "[t]heir taking is meant to be tightly confined to those exceptional cases where the interests of justice require the taking for the preservation of testimony for use at trial, and not for discovery." Tenn. R. Crim. P. 15, Advisory Comm'n. Cmt. Similarly, "there is nothing in Rule 16, governing pretrial 'discovery and inspection,' that could be taken to authorize court-ordered interviews with otherwise unwilling witnesses." Singleton, 853 S.W.2d at 493.

Prospective witnesses have the discretion to talk or not to talk to counsel for either party, and counsel may not instruct a witness not to discuss the facts of the case with opposing counsel. See id. It is well established that

> [p]rospective witnesses are not partisans, and they should be regarded as spokesmen for the facts as they see them. Because they do not 'belong' to either party, a prosecutor, defense counsel or anyone acting for either should not suggest to a witness that he not submit to an interview by opposing counsel.

Gammon v. State, 506 S.W.2d 188, 190 (Tenn. Crim. App. 1974). So long as this holding is not violated,

"[a] defendant is entitled to have <u>access</u> to any prospective witness although such right of access may not lead to an actual interview[. . . .] [A]ny witness has the right to refuse to be interviewed, if he so desires (and is not under or subject to legal process)[. . . .] The importance of the rights of access is somewhat tempered by the witness' equally strong right to refuse to say anything."

<u>Singleton</u>, 853 S.W.2d at 493 (quoting <u>United States v. Scott</u>, 518 F.2d 261, 268 (6th Cir. 1975) (quotation marks and citation omitted).

In Tennessee, the use of pretrial depositions is narrowly restricted, and counsel must rely on other methods to uncover the facts of a case, including the defense's opportunity to cross-examine witnesses at a preliminary hearing. <u>Id.</u> at 495 (citing Tenn. R. Crim. P. 5.1). In addition, Tennessee law requires the State to provide the defendant with a list of witnesses prior to trial. <u>Id.</u> (citing Tenn. Code Ann. § 40-17-106). "Although these avenues of limited discovery may not prove helpful in every case, they are among the only means of discovery currently provided in criminal cases." <u>Id.</u>

We conclude that the trial court had jurisdiction over the parties and acted within its discretion in holding that no further depositions of the State's witnesses could occur without leave of the trial court and that the defense was required to turn over to the State copies of any deposition transcript of any of the State's witnesses, even if these deposition transcripts were not anticipated to be used for impeachment purposes. A defendant in a criminal trial does not have the authority to depose witnesses who will testify on the State's behalf. <u>See</u> <u>id.</u> at 492. Moreover, as the State recognized in its motion, there were no hearings or court dates set in the Defendant's divorce case, which means that the trial court's order in the criminal case did not interfere with the divorce proceedings. If the Defendant felt he was prejudiced in his divorce case by the trial court's order precluding additional depositions, then he could raise that issue before the divorce court. Accordingly, we conclude that the trial court in this case acted within its discretion in ordering the Defendant to stop taking depositions in the divorce case and to turn over existing deposition transcripts.

**VI.  Unauthenticated Excerpt of Transcript.**  The Defendant contends that the trial court abused its discretion in allowing the State to utilize, during Dr. Berryman's direct examination, an unauthenticated excerpt of a purported transcript of A.C.'s testimony that lacked the court reporter's certification. First, the Defendant argues the trial court erred when it failed to require the State to follow the procedures in Tennessee Rule of Evidence 612. Second, the Defendant claims this error "was compounded" by the fact that this

transcript lacked indicia of reliability. The Defendant asserts that this error was not harmless because the defense's "entire case hinged on A.C.'s credibility, specifically as it pertained to the inconsistencies in her statements," because this evidence was not cumulative to other proof presented, and because A.C.'s testimony at trial failed to corroborate A.C.'s statements at her forensic interviews. The State responds that the trial court properly exercised its discretion when it allowed the State to use the transcript excerpt. The State also contends that Tennessee Rule of Evidence 612 does not require a court reporter certification on any document used to refresh a witness's recollection and does not require the document to have indicia of reliability. We conclude that although it appears the trial court erred in not requiring the State to follow the requirements in Rule 612, this error was harmless.

Several days prior to trial, a hearing was conducted regarding the State's intent to use an excerpt of the transcript of A.C.'s testimony from a temporary restraining order hearing in the divorce court. The defense objected because this transcript excerpt did not provide any identifying information for the court reporter who prepared the transcript, which prevented defense counsel from obtaining the complete transcript. Defense counsel argued that the Defendant "did not pay" for the transcript and had "no knowledge of who transcribed" A.C.'s testimony. He said that when he learned the State apparently only had the excerpts from this transcript, he asked the State for the identity of the court reporter who transcribed the testimony, and the prosecutor replied that he did not have the name of the court reporter and that Reguli and Ms. Cunningham had this information because they provided the transcript excerpts to him. Defense counsel argued that this was no different than requiring the defense to turn over the transcript of Ms. Cunningham's deposition in the divorce case.

The prosecutor explained that sometime around October 2020, he was surprised to learn that A.C. had given sworn testimony during a temporary restraining order hearing. Defense counsel interjected that he did not represent the Defendant at the time of this hearing, either in the divorce case or this criminal case. The prosecutor then stated that during this temporary restraining order hearing, Judge Scarlett examined A.C. in chambers, and A.C. provided sworn testimony. The prosecutor asserted that the fact that A.C. had given prior sworn testimony was "highly concerning" to him, and he knew he needed to obtain that transcript. He then contacted A.C.'s mother's lawyer, Ms. Megan Miller, who worked as an associate for Reguli, to find out, and Ms. Miller confirmed that A.C. had given in-chambers' testimony during this hearing, that there had been a court reporter, and that she could get the prosecutor a transcript. The prosecutor later received only the excerpts of the testimony given by both the Defendant and A.C. during that hearing. He stated, "That's all I asked for. That's all I got. [The excerpts are] all I've ever had." The prosecutor continued:

I am not in possession of any other transcript. I am not counsel of record in the divorce proceedings. I don't have anything to do with that, other than the fact that I reached out and asked. I don't know who else might have testified. I don't know who the court reporter was. I don't know . . . what Connie Reguli or Victoria Cunningham have in their possession. And I don't know whether they've got all of the hearing or not. I just don't know the answers to these questions. I don't have that information. And it's not in my exclusive control and possession.

The prosecutor reiterated that he knew he needed the transcripts if A.C. and the Defendant had given prior sworn testimony. He stated that although he did not know if he would make use of it, A.C. had given prior consistent statements of the Defendant's sexual abuse of her to Judge Scarlett during this in-chambers hearing. He also noted that "there might be problematic statements" the Defendant gave during the hearing before Judge Scarlett.

Defense counsel countered that it sounded like the State was going to use these transcript excerpts during trial and that neither the State nor the defense was able to identify who transcribed this hearing. Defense counsel stated that he had a "serious problem" with the State using these excerpts because he was never given information to verify whether he has a "complete and accurate transcript" of the testimony at this hearing. He noted that pursuant to the trial court's order, he had provided a transcript of Ms. Cunningham's deposition to the State that belonged to the Defendant, and he was simply asking "the State to do the same thing, especially if [the State is] intent or there's a possibility of using those transcripts[.]"

The trial court initially recognized that "the issues [were] slightly different." The court then held, "If the State doesn't have it, then I'm certainly not gonna [sic] require the State to go find out the information. I guess anyone could find out who a court reporter was at a [temporary restraining order] hearing." The court then held, "I'm going to deny the motion, to the extent that the State's required to comply with Rule 16."

During the State's redirect examination of Dr. Janie Berryman at trial, Dr. Berryman confirmed she was present for the testimony that A.C. gave in chambers to Judge Scarlett in the divorce case. The State then requested a bench conference. Defense counsel said he believed the prosecutor was going to introduce the "purported" transcript of A.C.'s testimony in chambers before Judge Scarlett as an exhibit. Defense counsel reminded the trial court he previously had "some concerns" about the transcript because there was "no court reporter listed on it." The prosecutor replied that he was only going to "have [Dr.

Berryman] read [the transcript] and put it up on the overhead, and not introduce it as an exhibit." The prosecutor explained that the transcript covered the in-chambers testimony that A.C. gave in response to questions by the Defendant's attorney and Judge Scarlett. He noted that A.C. gave "consistent statements about [the Defendant's] abuse in that in-chambers testimony" and made "lots of denials about anyone telling her what she's about to say there, in court that day."

The prosecutor stated that Dr. Berryman might be able to "authenticate it, as an accurate transcript of what [Dr. Berryman] witnessed" when A.C. provided the in-chambers testimony to Judge Scarlett. The prosecutor also argued that the defense had "ventured into this area of all of the divorce proceedings" and had elicited testimony about A.C.'s in-chambers testimony to Judge Scarlett. Defense counsel replied that he had argued during the pre-trial motion that he repeatedly asked the State to identify the court reporter so he could get a full copy of the transcript to ensure that it was authenticated. He argued that this transcript was never authenticated and consequently, he was "objecting for it to come in."

The trial court asked if this was a transcript of what happened while Dr. Berryman was present, and the prosecutor replied, "Yes. She just testified at least twice, maybe three times, that she [was] present in chambers, in Judge Scarlett's chambers, while [A.C.] gave this testimony." The prosecutor also noted that Judge Scarlett clearly addressed Dr. Berryman at the end of A.C.'s in-chambers testimony. The trial court asked the State why, if Dr. Berryman was present during A.C.'s testimony, did the State need the transcript if the State could simply ask Dr. Berryman what A.C. said during this hearing. The prosecutor responded that despite his numerous objections, the jury heard proof regarding the divorce court's rulings regarding visitation. He said he was "somewhat shocked by some of the rulings that came out of Chancery Court in this case" and that Dr. Berryman had also stated that she was shocked by the Chancery Court's rulings. The prosecutor said the defense had argued that even after A.C. provided this in-chambers testimony, Judge Scarlett "still ordered visitation" for the Defendant. The prosecutor said he believed that it would assist the jury "to know just what kind of proof" was in front of the Chancery Court, so the jury could "make their own assessment as to what kind of decision [regarding visitation] that was."

Ultimately, the trial court held that if Dr. Berryman could state that the transcript was "an accurate representation" of what was said during A.C.'s in-chambers testimony, then it would allow Dr. Berryman to "authenticate" that the transcript excerpt was what occurred during A.C.'s testimony. The trial court clarified that the State "can refresh [Dr. Berryman's] recollection [of A.C.'s testimony] with the transcript." The prosecutor asked Dr. Berryman if she had read the transcript, and when Dr. Berryman replied that she had just "read it all," defense counsel objected to the fact that Dr. Berryman read the

"uncertified copy" of the transcript as they were "arguing this objection"  The prosecutor said Dr. Berryman would be "free to answer any questions" about whether the transcript was accurate.  The trial court then allowed the State to use the transcript excerpt to refresh Dr. Berryman's recollection regarding A.C.'s testimony at this in-chambers hearing.

When the trial resumed, the State asked if Dr. Berryman had reviewed and recognized the transcript, and Dr. Berryman replied that she did recognize the transcript, explaining that this was the transcript of A.C.'s testimony in Judge Scarlett's chambers, which she witnessed.  Dr. Berryman stated that although she was "in the outside room," she "could hear everything being said."  She stated that she remembered the questions asked of A.C. and A.C.'s answers.  Dr. Berryman then stated that the transcript at issue "look[ed] accurate."

The trial court then asked counsel to approach for a bench conference.  The court stated that it was "not gonna [sic] rule upon the transcript" and that the prosecutor was going to "need to take the transcript from [Dr. Berryman]" and then hand her the transcript to refresh her recollection.

When testimony resumed, Dr. Berryman stated that A.C. was asked during this in-chambers hearing whether her father had engaged in inappropriate contact with her, and A.C. replied that her father "had been inappropriate."  She said that A.C. then testified that her father "would lick her down there."  Dr. Berryman noted that she had "read through [the transcript] quickly."  She recalled that after A.C. provided this detail regarding the abuse, she was cross-examined, and A.C. was "consistent in saying something inappropriate happened."  She said A.C. was also asked if anyone had told her what to say during the hearing, and A.C. replied that no one had told her what to say.  Dr. Berryman said that during this in-chambers hearing, A.C. never denied that her father had abused her and was "consistent" about her father's sexual abuse.

At the motion for new trial hearing, the trial court made the following statements regarding this issue:

> My understanding is, that those [transcript excerpts] were given or turned over to the State.  That Dr. Berryman, in her questioning, was asked foundational questions as to the transcript.  That those were, perhaps, as the State has indicated, as equally available to [the Defendant] as they were to the State.  And I'm not sure the extent to which the State had authority over the folks who had the transcripts to . . . fall under the Rule of Discovery, where the State is required to turn those over.  And so, I'll stand by my . . . previous ruling during the trial and pre-trial [hearings].

First, the Defendant argues that the "trial court should have required the State to establish the proper foundation before allowing Dr. Berryman to refresh her recollection with the document," as required by Tennessee Rule of Evidence 612. He also asserts that there was "no indication in the record that the transcript was taken back from Dr. Berryman before her testimony about what A.C. testified to." Finally, he asserts "it appear[ed] Dr. Berryman was permitted to read the excerpt while testifying." He notes that Dr. Berryman admitted she was not even in the room while A.C. was testifying, but she claimed she could hear A.C.'s testimony from the other room.

Rule 612 of the Tennessee Rules of Evidence permits a witness to use a writing to refresh his or her memory:

> If a witness uses a writing while testifying to refresh memory for the purpose of testifying, an adverse party is entitled to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony, the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires; in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

Tenn. R. Evid. 612. The proper procedure for refreshing a witness's recollection is outlined in the Advisory Commission Comments to Rule 612, which state: "Only if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory." Tenn. R. Evid. 612, Advisory Comm'n Comment.

We conclude that the trial court erred in not requiring the State to follow the procedures outlined in Rule 612. See id. While the record shows that Dr. Berryman could hear A.C.'s testimony from the other room, the State never laid the foundation that Dr. Berryman needed to use the transcript excerpt to refresh her memory of A.C.'s testimony

during the in-chambers hearing. See State v. Price, 46 S.W.3d 785, 814-15 (Tenn. Crim. App. 2000) ("Prior to using a writing to refresh a testifying witness's recollection pursuant to Rule 612, an attorney must show that the witness's memory requires refreshing and that the writing will be useful in that regard."). Moreover, the State never retrieved the transcript excerpt before asking Dr. Berryman to testify about A.C.'s testimony at the hearing from her refreshed recollection. See id.; Price, 46 S.W.3d at 814.

Nevertheless, we conclude that these errors were harmless. See Price, 46 S.W.3d at 814-15 (holding that although the trial court erred in not requiring the State to show that the memory of two witnesses necessitated refreshing with the writing in question and erred in allowing these two witnesses to testify while retaining the writings used to refresh their recollection, these errors were harmless); see also State v. Dishman, 915 S.W.2d 458, 461 (Tenn. Crim. App. 1995) (concluding that it was harmless error when a witness, after having her recollection refreshed with a writing, retained this writing and continued to testify from it). The trial court's errors regarding Rule 612 did not affect the results of the trial. See Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). There was no indication that Dr. Berryman read from the transcript or somehow exceeded the boundaries of refreshing her recollection. In addition, while the State should have shown that Dr. Berryman's memory needed refreshing regarding A.C.'s testimony, the evidence that the Defendant licked A.C.'s privates was not new information because the jury had already watched the second forensic interview, wherein A.C. disclosed this specific type of abuse by the Defendant. Accordingly, we conclude these errors were harmless.

Second, the Defendant claims the trial court's error regarding refreshing recollection "was compounded" by the fact that the transcript lacked any indicia of reliability. Specifically, the Defendant argues that the transcript was "incomplete," did not show who was present for the testimony, did not identify the court reporter who transcribed the testimony, and did not contain a certification of accuracy by the court reporter. The Defendant claims there was no way for him to obtain a full copy of the transcript or confirm its accuracy. He also asserts that it was "prejudicial for [him] not to have a complete copy of the transcript to use at trial, especially because this hearing [before Judge Scarlett] ultimately ended in his favor and cast doubt on the veracity of A.C.'s sexual abuse allegations."

This Court has previously held that "Rule 612 does not limit the type of writing that may be used to refresh a testifying witness's recollection[.]" Price, 46 S.W.3d at 813. In addition, the author or source of the writing is irrelevant:

Rule 612 applies to a "writing." It does not prescribe who must author the writing or [be] the source of the writing. Rule 612 applies to any writing used to refresh a witness's memory, irrespective of who prepared the writing, when it was prepared, or whether the witness had ever seen the writing until the moment of testimony. The writing used to refresh memory need not be admissible and the best evidence rule, Rule 1002, is inapplicable.

Id. at 813-14 (Tenn. Crim. App. 2000) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 612.2, at 402 (3d ed.1995) (emphasis added).

These authorities clarify that Rule 612 does not require a writing to have indicia of reliability or to be "complete" before the writing is used to refresh a witness's recollection. Nor does Rule 612 limit the type of writing used to refresh recollection. Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

We affirm the judgments of the trial court but remand the case for entry of corrected judgment forms in Counts 1 through 13 to reflect the Defendant's effective 100-year sentence.

s/_____*Camille_____R.*
*McMullen*_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE